OPINION OF THE COURT
Chief Judge Cooke.
An attorney who presents a well-grounded but unsuccessful defense will not later be held to have provided ineffective assistance of counsel, and thus a defendant will not be entitled to a vacatur of his conviction on such basis.
Joseph Baldi was convicted after separate trials for unrelated crimes committed nine months apart. The first judgment, entered November 24,1974, convicted defendant of attempted murder, burglary in the second degree, and felonious possession of weapons. The second judgment, entered January 16, 1975, convicted defendant of murder in the second degree. The Appellate Division, Second Department, reversed both convictions on the ground that Baldi was denied the effective assistance of counsel. The People appeal from the order of reversal. The Appellate Division’s order is now reversed.
I
The facts are taken from testimony at the two trials and the pretrial suppression hearing.
*141 In the early hours of September 5, 1971, police received a prowler complaint in Queens. While investigating, two officers saw Joseph Baldi walking down the sidewalk at 5:00 A.M. When asked by Officer John Hamberger what he was doing in the area, Baldi responded that he had just left his girlfriend and was on his way to work. Dissatisfied with defendant’s answers to further questions, Officer Hamberger asked for identification. Baldi reached for his pocket as though to take out his wallet, but instead produced a pistol, pointed it at the officer’s chest, and pulled the trigger. Fortunately, the gun misfired and the officers wrestled Baldi to the ground and disarmed him.
Baldi was handcuffed, arrested, and placed in the police car. After being read the Miranda warnings, he was searched. Live ammunition was found in the gun, which was operable, and more ammunition was found in defendant’s jacket. In addition, there were found in Baldi’s wallet a license, registration, and Social Security card belonging to a woman who lived nearby. Defendant claimed he had found the items on the street. Subsequent investigation revealed that the woman’s handbag, found the next dáy in a trashcan, had been stolen from her dining room table earlier that night.
Legal Aid Society representation was provided for Baldi. He was indicted in December, 1971, for, among other charges, attempted murder of a police officer, burglary, and possession of a weapon. The defendant, however, was found to be incompetent to stand trial after examination at Kings County Hospital. From there, Baldi was sent to Mid-Hudson State Hospital and then to Creedmoor State Hospital. In February, 1972, Baldi was released from Creedmoor without notice to the District Attorney or the court.
On June 17,1972, at about 3:30 A.M., 15-year-old Deborah Januszko was fatally stabbed through her open bedroom window as she slept. On June 20, at about 5:00 A.M., Detective Donald Palmer spotted Baldi while staking out the Januszko neighborhood. Baldi identified himself and stated that he was attending a trade school in the area.
After investigating Baldi’s story, Palmer went with an *142 other officer to Baldi’s apartment for more information. At around 12:15 A.M., of June 21, Palmer met Baldi in the building’s hallway, identified himself, and asked if Baldi would come to the homicide squad for questioning. As related by Palmer at a subsequent suppression hearing, defendant immediately mentioned the earlier charge concerning the attempted murder of the police officer, apparently assuming that Palmer’s interest concerned that incident. Palmer asked what had happened in- that case and defendant responded, according to Palmer’s testimony, that “he went to — or was sentenced to Creedmoor State.” When defendant asked whether Palmer knew about the charge, Palmer’s only response was that the officers were there to investigate the Januszko slaying. No further inquiries were made into Baldi’s statement or whether he had an attorney. Prior to this conversation, Palmer was personally unaware of the first charge or arrest.
At Palmer’s request, Baldi allowed the police to enter his apartment. Among other things, they found a number of knives and sexually explicit magazines. In response to the detective’s renewed request, Baldi agreed to accompany the officer to the police station.
At the station, Baldi received a full recitation of his Miranda rights. The defendant acknowledged that he understood all the warnings and answered questions put to him by Detective Angelo Lamardo. Aftr Lamardo reviewed some preliminary matters, the magazines and knives found in Baldi’s apartment were brought into the interrogation room. Lamardo began thumbing through one of the magazines and making deprecatory remarks about the models; Baldi defended them, stating that they were not degenerates and then reached out to touch the photographs. Baldi’s knives were placed before him and more questions asked, leading to a specific inquiry about the Januszko slaying. Baldi went into a trance-like state and pantomimed the stabbing. During the night, he did this twice more in the station house, each time explaining his actions in response to Lamardo’s questions. After each of the three re-enactments, defendant fell to the floor and had to be assisted to his feet. Finally, around 5:30 A.M., he was taken to the *143 Januszko home, where he once again acted out the killing. This time, he did not collapse after he re-enacted the crime. Baldi was returned to the police station and charged with murdering Deborah Januszko.
On June 22, 1972, Sidney Sparrow was assigned as counsel for Baldi on the Januszko murder charge. At some later date, Sparrow also assumed Baldi’s defense on the earlier charges.
Thereafter, Sparrow learned that the police believed Baldi possibly was responsible for other unsolved burglary-murders that had occurred in Queens over several years. On July 7 and 14, Baldi was questioned by Lamardo in the presence of Sparrow, other detectives, and two county psychiatrists. In these interviews, Baldi again confessed to the Januszko slaying, and also confessed to three other murders as well as 10 assaults on women. At the July 7 meeting, Baldi went into the same sort of trance as on June 21 and described his acts as though occurring at that moment. At the second of these interrogations, Baldi was hypnotized by a psychiatrist and this time described his acts as occurring in the past.
On July 8, 1972, Baldi was indicted for the Januszko murder. On July 18, he was indicted for the three other murders to which he had confessed. No trial on any of the indictments was held until late 1974. During the interim, Baldi was examined on three occasions and found competent to stand trial. Sparrow accepted these findings without demanding a hearing.
In October, 1974, Baldi was tried by jury on the indictment arising from the September, 1971 incident involving the police officer. Baldi pleaded not guilty and not guilty by reason of insanity. The defense theory, other than factual innocence, was that defendant was schizophrenic, having two or more personalities. The defendant took the stand and denied the events as testified to by the arresting officers. On direct examintaion by Sparrow, Baldi also denied committing or confessing to the crimes he had described in the July, 1972 interviews. Sparrow took the stand himself, with the consent of both the Assistant District Attorney and the court, and testified in detail to what he had ob *144 served during these interviews, recounting his client’s admissions to the murders and assaults. Sparrow also testified that on June 22, 1972, the day after defendant’s arrest for the Januszko murder, he visited the defendant at Kings County Hospital where Baldi was being held for examination. Sparrow described Baldi as shuffling along without lifting his feet, speaking in grunts and in a barely audible voice, and unable to hold Sparrow’s business card when placed in his hand, apparently unaware of its presence. Expert testimony was also presented to establish Baldi’s insanity and inability to comprehend the nature and consequences of his acts. Baldi’s defense failed and he was convicted for attempted murder of a police officer, burglary in the second degree, and felonious possession of weapons. Baldi received consecutive sentences for his crimes.
In early November, 1974, a Huntley hearing was held to determine whether Baldi’s statements at any of the three examinations would be admissible at his murder trial. Again, Sparrow took the stand. Concerning the circumstances under which he allowed defendant to be interviewed, disputed by the Assistant District Attorney, Sparrow testified that, after being informed of Baldi’s possible involvement in other murders, Sparrow agreed to the interviews on the understanding that nothing said by the defendant would be used against him. Sparrow, in support of the claim of involuntariness by reason of insanity, also testified to Baldi’s appearance when they first met on June 22, as well as to Baldi’s conduct at the July, 1972 examinations. At the conclusion of the hearing, the Judge ruled that the June 21 confession was voluntarily made and thus admissible against the defendant. As to the other statements, although the court did not expressly find an agreement had actually been made, it noted Sparrow’s expertise in criminal law and reliance on his understanding of the arrangement in ruling that Baldi’s constitutional rights would be violated if his July, 1972 statements were used against him. Consequently, the Judge suppressed the confessions made on July 7 and 14, 1972.
In late November, 1974, Baldi pleaded not guilty by reason of insanity to the Januszko murder and was tried *145 without a jury. Baldi again took the stand and denied killing Deborah Januszko or recalling his confession. Some very general remarks were also elicited by Sparrow on direct examination about the July, 1972 interviews, basically to the effect that defendant did not recall that he had admitted committing other assaults or murders. Sparrow, again with no objection from the prosecutor or the court, also took the stand. On direct, he testified only as to Baldi’s dazed appearance and unusual behavior on June 22 and his general demeanor at the July interviews. On cross-examination, Sparrow testified that Baldi had confessed to other murders, but that Baldi recalled only that Sparrow told him after the examinations what he had done, not the confessions and re-enactments. Expert testimony as to Baldi’s mental state was also presented. The court found the June 21 confession to be voluntary, the defendant sane at the time of the Januszko killing, and guilty of second-degree murder. Baldi was sentenced to an indeterminate term of 25 years to life.
Baldi obtained new counsel and appealed to the Appellate Division, arguing that his sanity had not been proven beyond a reasonable doubt and that Sparrow’s conduct was such that it denied defendant the effective assistance of counsel. Although the proof-of-sanity question was decided against defendant, a majority of the Appellate Division determined as a matter of law that Baldi had been denied the effective assistance of counsel and ordered both judgments of conviction reversed.
The People were granted leave to appeal to this court. They argue that Sparrow’s conduct at both trials was an innovative defense tactic, not an incompetent or ineffective performance. In response, defendant maintains that Sparrow’s actions were not reasonably competent. Defendant also urges, apparently for the first time, that his June 21 confession was improperly admitted at his murder trial because his waiver of counsel was ineffective in the absence of counsel assigned to represent him on the pending attempted murder charge. We conclude that defendant was accorded effective assistance of counsel, but that his other argument presents a question warranting further review.
*146 II
The right to the effective assistance of counsel is guaranteed by both the Federal and State Constitutions (US Const, 6th Arndt; NY Const, art I, § 6). What constitutes effective assistance is not and cannot be fixed with yardstick precision, but varies according to the unique circumstances of each representation (see People v. Droz, 39 NY2d 457).
This court has not articulated an inflexible standard, applicable to all cases, against which an attorney’s effectiveness will be measured. Indeed, in Droz, this court concluded only that the defendant’s representation, under all the circumstances presented, could not be considered “adequate or effective in any meaningful sense of the words” (39 NY2d, at p 463). In People v Aiken (45 NY2d 394), the court recognized that there have developed two different standards appropriate for reviewing an attorney’s effectiveness. The traditional standard has been whether the attorney’s shortcomings were such as to render the “ Trial a farce and a mockery of justice’ ” (id., at p 398, quoting People v Brown, 7 NY2d 359, 361, cert den 365 US 821; People v Bennett, 29 NY2d 462, 467; People v Tomaselli, 7 NY2d 350, 354). A newer, stricter standard, developed predominantly in the Federal courts (see, e.g., United States v Fessel, 531 F2d 1275; United States v Elksnis, 528 F2d 236; United States v Toney, 527 F2d 716, cert den 429 US 838; United States v De Coster, 487 F2d 1197), is whether the attorney exhibited “reasonable competence” (45 NY2d, at pp 398-399). The Aiken court did not choose one standard over the other, concluding rather that the attorney’s conduct was considered effective under either (id.).
Our most critical concern in reviewing claims of ineffective counsel is to avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis. It is always easy with the advantage of hindsight to point out where trial counsel went awry in strategy. But trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness. *147 So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaninful representation, the constitutional requirement will have been met (see People v Jackson, 52 NY2d 1027; People v Aiken, 45 NY2d 394, supra; cf. People v Bell, 48 NY2d 933; People v Droz, 39 NY2d 457, supra).
Defendant urges that numerous instances establish Sparrow’s ineffectiveness. His argument focuses primarily on five areas of alleged inadequacy by Sparrow: (1) the failure to pursue Baldi’s claim of actual innocence in the first trial; (2) the handling of both defense and prosecution expert witnesses; (3) Sparrow’s testifying at the two trials and the Huntley hearing, as well as his summations; (4) Sparrow’s role in bringing about the July 7 and 14, 1972 interrogations; and (5) the quality of effort made to suppress Baldi’s June 21 confession. It is concluded that Sparrow’s performance as a whole cannot be said to have denied defendant the effective assistance of counsel. When considered in context, all but the fourth item involve tactical decisions concerning a difficult and innovative defense.
As to the contention that Sparrow did not strenuously pursue the factual-innocence defense, it should be noted that counsel reasonably could have urged his client’s factual innocence, or his insanity, or both. The factual-innocence defense itself was weak. It is true that Sparrow had his client’s claims that when the officers approached him he was carrying only a .22 caliber starting pistol and that he had found the property later discovered to have been stolen. Baldi, however, had made incriminating statements after his arrest. And the prosecution had two police officers who had seen — in fact, had been the targets of — Baldi’s attack and had seized live ammunition from him. The circumstantial evidence of burglary was also very strong. Defendant thus faced a formidable case against him. Certainly, it would not be ineffective assistance if an attorney tried to plea bargain for his client under such circumstances. Just as an attorney whose client offers a weak alibi defense may choose as a matter of strategy to adopt another tack (see People v Ford, 46 NY2d 1021), so, too, *148 an attorney is not required to argue factual innocence at the expense of a stronger defense. In addition, Sparrow did argue the innocence defense to the jury, pointing out the weaknesses in the People’s case.
From all that appeared, Sparrow indeed had a much stronger defense in the claim that his client was insane at the time of the crimes. Baldi had been found incompetent to stand trial when first arrested in September, 1971. His subsequent conduct after the arrest for the Januszko slaying demonstrated a continuing mental imbalance. All of the expert witnesses agreed that to some degree Baldi was mentally unfit, if not legally insane.
Contrary to defendant’s contention, Sparrow’s handling of the expert’s testimony was not unreasonable. As to his own witness, Dr. Harry La Burt, Sparrow did not contradict the psychiatrist, but sought only to clarify the doctor’s testimony for the jury. Nor is there merit to defendant’s claim that Sparrow failed to press the prosecution’s psychiatric witness, Dr. Daniel Schwartz, about his subordinates’ diagnoses made in September, 1971, which comported with Dr. La Burt’s evaluation and contradicted Dr. Schwartz’ analysis. In fact, Sparrow explored this issue in depth while cross-examining Dr. Schwartz, a veteran of hundreds of criminal trials, but was unable either to shake the doctor’s criticism of his less experienced colleagues’ diagnoses or to induce him to modify his own conclusion as to Baldi’s condition.
Sparrow’s taking the stand was consistent with and strengthened the insanity defense. By testifying, Sparrow was able to introduce evidence not only that his client had committed a large number of sexually based assaults and murders, re-enacting crimes while in a trance, and thereby manifesting a lack of moral sensibility (see People v Wood, 12 NY2d 69; People v Garrow, 51 AD2d 814), but also that defendant could not recall making these admissions before a number of witnesses. This testimony helped to lay the foundation for the expert witnesses who appeared later. True, Sparrow contradicted his client, but did so for a proper purpose — the establishment of the insanity de *149 fense.[1] Nor was there impropriety in Sparrow’s remarks in summation, during which he understandably declined to vouch for his client’s credibility, but argued the weaknesses in the State’s case and emphasized defendant’s insanity.
While much of what has been said is equally applicable to both trials, it should be noted that Sparrow’s role as a witness at the murder trial was far less involved than in the earlier proceedings. In the second trial, Sparrow downplayed the details of the crimes admitted in the July confessions both in examining Baldi and in his own direct testimony, which Sparrow limited to Baldi’s appearance and behavior at their meetings in June and July, 1972. Having concluded that Sparrow’s conduct at the attempted-murder trial did not deny defendant effective assistance of counsel, certainly Sparrow’s more limited role at the second trial does not amount to ineffectiveness.
Sparrow’s participation in the July 7 and 14, 1972 examinations superficially raises a more serious question of effectiveness. Given the resulting controversy as to what occurred, undeniably it would have been better for Sparrow to have obtained from the Assistant District Attorney a written agreement not to use Baldi’s statements against him. As later events unfolded, however, Sparrow’s participation lost all significance. Following the Huntley hearing, all the statements were apparently suppressed[2] on the strength of Sparrow’s testimony. Under the circumstances, defendant’s objection to Sparrow’s actions amounts to no more than a challenge to his effectiveness in the abstract. *150 Defense counsel should be diligent in safeguarding a client’s rights, but it would be remiss to declare that an attorney is ineffective if he assists the police by permitting the interrogation of a client who is promised immunity with respect to other crimes.
Nor was Sparrow’s conduct at the Huntley hearing objectionable. He was a witness to defendant’s dazed condition and unusual appearance at King’s County Hospital on June 22, the day after Baldi’s arrest. In fact, the hearing Judge himself stated that he believed Sparrow would be violating the Code of Ethics if he failed to testify. Additionally, as noted, the Judge’s decision on the suppression motion suggests that the testimony by Sparrow strongly persuaded the Judge that there had been an agreement between Sparrow and the Assistant District Attorney.
Defendant also attacks Sparrow’s failure at the Huntley hearing to produce psychiatric testimony about Baldi’s condition following his arrest. While it may have been wiser as a matter of tactics to produce an expert, Sparrow’s conduct of the hearing certainly does not evince an inadequate effort to suppress the June 21 confession. Sparrow elicited the interrogating officer’s testimony that when Baldi confessed, he had a “vacant stare”, “glassy eyes”, and did not speak in a “normal voice”. Sparrow himself testified as to Baldi’s condition on June 22. Finally, Sparrow again raised the voluntariness issue at the murder trial itself and did produce considerable expert testimony. All in all, it cannot be said that Sparrow’s omission, at worst a questionable tactical decision, established an inadequate attempt to suppress.
In a more general challenge, defendant argues that, when Sparrow took the stand in all the proceedings, defendant was left without counsel at critical stages of the criminal process. It is true that, under some circumstances, • a defendant has been denied effective assistance of counsel when his attorney testified in court (see People v Kennedy, 22 NY2d 280; People v Rozzell, 20 NY2d 712). Those cases are distinguishable, however, in that counsel there was requested by the court to testify in such a manner as to represent the State rather than the defendant. In contrast, *151 counsel here decided to take the stand to further the defense. At all times, he remained in the courtroom and was seeking to protect his client’s interests.
Sparrow, faced with his client’s admissions to a series of heinous crimes as well as his client’s behavior during all of the interviews, had strong grounds to believe that the defendant was legally insane. He could therefore properly conclude that the best tactical approach would be one of concentrating on the insanity issue while presenting other exculpatory evidence such as Baldi’s claim of factual innocence.
The defense presented by Sparrow is accepted in the law. That a defense attorney, in attempting to establish insanity, adduced testimony as to the defendant’s other crimes is not unknown in this State (see People v Wood, 12 NY2d 69, supra [Assistant District Attorney testified] ; People v Garrow, 51 AD2d 814, supra [defendant testified]). We are not confronted here with an attorney who presents a new defense unknown to the law and who then fails to explain the essence of the defense (see People v Bell, 48 NY2d 933, supra). Nor did counsel engage in conduct unsupportable as a defense tactic, such as joining in a motion which not only incriminated his client, but contradicted the only defense theory proffered (id.).
Sparrow made a valiant effort to establish his client’s lack of criminal responsibility. Not only was expert testimony presented, but counsel also offered lay testimony of direct observations of the defendant’s unushal behavior. Some of Sparrow’s tactics were daring and innovative. Hindsight should not escalate what may have been a few tactical errors into ineffective assistance of counsel (see People v Jackson, 52 NY2d 1027, supra).
Sparrow put all his 40 years’ experience to work for Baldi and produced a vigorous and competent defense. While taking the stand had the potential for irreparable harm, overall, Sparrow handled the matter professionally and consistently with the defense theory of insanity. His professional conduct cannot be said either to have been unreasonable or to have made a farce and mockery of the *152 trial. Thus, it simply cannot be said as a matter of law that defendant was denied effective assistance of counsel. It is concluded, therefore, that the Appellate Division erred in reversing defendant’s convictions on this ground.
Ill
There remains, however, defendant’s other argument in support of reversal of his second-degree murder conviction — that he was denied counsel at his interrogation on June 21 and thus that his confession should have been suppressed. It is undisputed that, when arrested for the Januszko murder, defendant was actually represented by counsel on the pending unrelated attempted murder charge and that defendant mentioned this charge to Detective Palmer prior to interrogation. Under the law of this State, Baldi’s waiver of counsel in the absence of his attorney may have been ineffective (see People v Bartolomeo, 53 NY2d 225).
There are, however, factual questions that cannot be resolved as a matter of law on this record. As the right-to-counsel issue was raised for the first time in this court and the Appellate Division has not had an opportunity to consider the matter, further proceedings are required.[3]
JV
Since the Appellate Division erred in concluding as a matter of law that defendant was denied effective assistance of counsel, reversal of that court’s order is appropriate as to both judgments. Further proceedings are required, however, for the Appellate Division has not yet invoked its power to review questions of fact or to exercise its discretion. The case, therefore, should be remitted for such review, including review of the suppression issue, and any corrective action thereafter deemed appropriate. The Appellate Division may determine that the present record is inadequate to decide the right-to-counsel issue as to thq *153 second conviction so that a further hearing on defendant’s motion to suppress on the murder charge is required. In the event that suppression is ultimately denied after such hearing and no new trial is required on any other grounds, a new judgment should be entered so as to preserve the defendant’s right to have the suppression determination reviewed.
Accordingly, the order of the Appellate Division should be reversed, and the case remitted for further proceedings in accordance with this opinion.
Judges Jasen, Gabrielli, Jones, Wachtler, Fuchs-berg and Meyer concur.
Order reversed and case remitted to the Appellate Division, Second Department, for further proceedings in accordance with the opinion herein.

. Sparrow’s continued representation of Baldi upon determining that he would testify raises a question of ethics (see DR 5-101, 5-102). As the Appellate Division noted, Sparrow testified in Baldi’s presence that he had discussed with his client what he was about to do. Here, Sparrow was faced with the desirability of adducing this evidence, but, other than himself, had only hostile witnesses through which to present these events. Furthermore, there is some evidence that defendant was wary of strangers and trusted Sparrow, so that Sparrow’s withdrawal as counsel might have been ill-advised. Consequently, under all the circumstances, it cannot be said as a matter of law that Sparrow’s conduct in this regard was either unethical or ineffective.

. While the scope of the court’s order is unclear, the People concede in their brief that defendant’s July confessions to Januszko’s murder were also suppressed. No attempt was made to introduce those statements at trial.

. Baldi’s interrogation on June 21 did nothing to prejudice his rights as to the first indictment. Consequently, his conviction for attempted murder, burglary, and possession of weapons is unaffected by the right-to-counsel issue.