THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v JOSE M. NATAL, Respondent.

First Department, July 5, 1984

#### APPEARANCES OF COUNSEL

*Joyce P. Adolfsen* of counsel (*Mark Dwyer* with her on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for appellant.

*Barry D. Leiwant* of counsel (*William E. Hellerstein,* attorney), for respondent.

#### OPINION OF THE COURT

FEIN, J.

The People appeal from an order, Supreme Court, New York County (Jerome Marks, J.), entered June 27, 1983, setting aside defendant's conviction for murder in the second degree and directing a new trial.

The prosecution's case was based on the testimony of Lewis Easterling (Easterling), the co-worker and companion of Alphonse Suss (Suss), the homicide victim. The two

men had just finished their overnight 6:00 P.M. to 1:30 A.M. shift as maintenance workers at the World Trade Center, had cashed their paychecks, and were on their way home. On their way to the subway, they stopped at City Hall Park to eat a sandwich. At about 4:00 A.M., while Suss returned to the sandwich shop to get a pack of cigarettes, Easterling observed a car pull up and drop off a passenger (defendant) who set a beer bottle on the ground before bidding farewell to the car's other occupants. When Suss returned, he and Easterling walked to the subway entrance, casually referring to their job in vulgar terms. Defendant, who was now following them, admonished the pair for cursing: "I don't want you all cursing no more." When the pair shrugged him off, defendant displayed a gun and a shield, and announced that he was a cop. Easterling responded, "If you are going to shoot me you have to shoot me for nothing because I didn't do anything. You have to shoot me in the back." He and Suss continued walking to the subway. Defendant demanded they stop cursing. He warned, "When you go in the train station that is my territory". Easterling told defendant that they weren't bothering him. Suss added, "Well, you're bothering us." At this point, defendant grabbed Suss by the chest and said: "I blow you guys brains out and nothing will happen to me and I'll read about it in the paper tomorrow." "I'll blow your fucking brains out." Defendant told Easterling to go down into the train station. As Easterling was going into the station he saw defendant force Suss to his hands and knees. Defendant was holding a gun and a pair of handcuffs over Suss. Unable to find a policeman in the subway station, Easterling returned to the subway entrance. He saw defendant and Suss smiling. Defendant had his arm around Suss' shoulder. Defendant was still holding his gun. Defendant and Easterling exchanged words about cursing, "What is the beef?" Defendant then asked whether Easterling had any "funny cigarettes", which Easterling took to mean marihuana. Defendant patted Easterling's pocket, but Easterling assured him that the only things he had in the pockets were the proceeds of his paycheck and a pack of Viceroy cigarettes. When Suss asked defendant to "stop waving the gun", defendant again became angry, grabbed Suss' clothing around the chest, cocked the gun hammer

and placed the barrel against Suss' jaw. Defendant repeated the threat "I'll blow your brains out". Defendant then pulled the trigger and fired the gun, killing Suss. Defendant then told Easterling, "You get the fuck out of here". Easterling ran in a panic into the subway station, took the next train one stop, and called a friend who met him nearby and drove him back to the crime scene, which was by this time secured by the police. Easterling at all times thought defendant was a "cop". Defendant had a gun, a shield and handcuffs.

Defendant's story throughout the investigation and these proceedings is factually different in one key respect. Defendant had finished work as a bank security guard at 12:15 and went with a couple of co-workers to drink at a nearby bar, where he consumed six "boilermakers" (beer and scotch) between then and 4:00 A.M. One of his companions needed assistance in getting home, and another offered to drive, dropping defendant off near the subway station at City Hall Park. Defendant testified that as he walked to the subway entrance, Easterling and the victim attempted to rob him. He pulled out his gun attempting to scare them off, but the gun accidentally fired. Defendant then fled by taxi to his home in Brooklyn, where he told his family that he had just shot a would-be robber. He told the same story to the police when they came for him a week later, and signed a 17-page statement to that effect for the police when he surrendered the gun. This statement was consistent with the video taped statement later given to the District Attorney.

Defendant's trial testimony was similar. He also stated that he had been drinking, was a "little tipsy", but he knew what he was doing. "I felt I could handle my own." He stated that six boilermakers was "a lot" for him to consume. However, he testified he knew he drew the gun and "deliberately cocked it" as he "pulled it up." However, he said, "It went off by mistake." His purpose was "to detain the robber. I was protecting myself."

Defendant was indicted for intentional murder and murder under the theory of depraved indifference. The jury was charged to consider these offenses as well as the lesser included offenses of first and second degree manslaughter

and criminally negligent homicide, as well as the defenses of justification and intoxication. Defendant was represented at trial by an attorney, Matarazzo, retained by his family, who took on an associate, Guttman, as cocounsel. The jury found defendant guilty of intentional murder, and he was sentenced in November, 1980, to 15 years to life imprisonment.

At the time of sentence, the court denied defendant's motion to set aside the verdict as against the weight of the evidence. However, the court was critical of defense counsel for not developing an intoxication defense during the trial. The court opined that medical testimony should have been presented regarding the combined effect of alcohol and marihuana.

Two months later, February 4, 1981, the court rendered an extensive written opinion to the same effect. The court found the evidence was legally sufficient to sustain the jury's verdict. Much of the opinion consisted of a critique of defense counsel and their strategy and adverted to matters "not otherwise part of the trial record."

Twenty-two months later, defendant moved before the same Trial Judge to vacate the judgment for denial of effective assistance of counsel at trial based on a failure to develop a defense based on diminished capacity to commit the crime. During the lengthy hearings on this motion, there was testimony by defendant that he acquired drinking and marihuana habits while serving in the Army in Vietnam. On the night in question he started out drinking beer, then switched to "six, seven, maybe more" drinks of scotch. During this period he also smoked "four, maybe five joints" of marihuana. Defendant's description of the crime was now consistent with that of the prosecution. He now admitted intervening to chide Suss and Easterling for cursing, and to pulling the gun in order "to scare" the victim. Concerned that Easterling, who had his hands in his pockets, might be armed, defendant got nervous and cocked the hammer, after which the gun went off accidentally. On his way home in the taxi he fabricated the story about foiling an attempt to rob him. Defendant testified that he related the true story as well as the concocted story to Matarazzo and explained he had told only the concocted

story to his family and the police and to the District Attorney. He asserted that later, when being prepared to take the stand, counsel advised that the defense strategy would be to pursue the defense in the "robbery" version, notwithstanding the fact that counsel was aware not only that defendant had been drinking that night, but also that the robbery story was a fabrication.

Defendant also told the court during the hearing that he smoked marihuana and occasionally drank alcohol during the course of the trial, during breaks and when he got home at night. All told, he allegedly had only three meetings with his attorneys during the 15 months prior to trial. He assertedly was encouraged to persist in the false story he had told the police. He claimed that in the brief encounters with his attorneys prior to trial, he was prepared only on the fabricated story he had told the police, eschewing any defense based on diminished capacity by reason of intoxication, or any discussion of lesser included offenses, even though his attorneys supposedly knew that he had a "drinking problem". Although not an alcoholic, he had been drinking and smoking marihuana on the night of the crime.

In granting the postjudgment motion, the court ruled that defendant had been ill-served by counsel in failing to prepare adequately and to develop "not just the obvious, but the only defense" of intoxication. This would have been consistent with defendant's several hours of drinking prior to the homicide, his "serious alcoholic drinking problem" as indicated in a prepleading report prepared in advance of trial, and the probability that he had also been smoking marihuana that night. "Counsel ignored these circumstances despite the fact that it was always Natal's firm declaration and testimony that he did not intend to shoot decedent."

This conclusion ignores Natal's declaration that he was not intoxicated and his repeated written and oral statements that he was defending himself against a robbery.

Defendant's repeated version of the events, given to his family and to the police in writing, in a video taped interview with the District Attorney and in a written statement

furnished to counsel, to wit, that he was resisting an attempted robbery at the time of the events giving rise to the shooting of Suss, could not be ignored. As a consequence, it was not inappropriate for the attorneys to conclude that the best approach at trial was to (1) rely upon a justification defense, (2) underscore that the shooting was accidental, and (3) emphasize that Natal had been drinking prior to the incident. The fact that counsel and defendant disagreed as to whether defendant should testify is not dispositive. This is not an infrequent occurrence in criminal trials.

It appears that Matarazzo and Natal thought that defendant should testify. Although Guttman disagreed, he later reversed his position. It was only during the trial that Guttman learned that Natal claimed he had smoked marihuana the night of the incident. Contrary to Natal's version, Guttman testified Natal visited the law office from time to time during the pendency of the case.

The court had a number of other criticisms of the manner in which defendant was represented at trial. Particular reference was made to the opening statement by Matarazzo, and the closing by Guttman, as confusing and woefully inadequate. On the postjudgment motion, the court was disturbed that Matarazzo failed to appear to refute defendant's contentions during these lengthy hearings. But Guttman did appear. He testified defendant had never told him, nor to his knowledge had ever told Matarazzo, any version of the events inconsistent with the robbery defense. Guttman testified that defendant had definitely taken the position that he was not intoxicated during the incident, that he had drawn the gun only because he thought he was being robbed, and that the gun had gone off accidentally.

In determining whether there has been ineffective representation by counsel, the inquiry is whether the attorney's alleged shortcomings were such as to render the trial "a farce and a mockery of justice", or whether the attorney exhibited "reasonable competence" under all the circumstances of the trial.

What constitutes effective assistance cannot be fixed with precision. It varies according to the circumstances of

each case (*People v Baldi,* 54 NY2d 137; *People v Droz,* 39 NY2d 457). As these cases hold, the standard is not inflexible.

As stated in *Baldi* (54 NY2d, at pp 146-147): "Our most critical concern in reviewing claims of ineffective counsel is to avoid both confusing true ineffectiveness with mere losing tactics and according undue significance to retrospective analysis. It is always easy with the advantage of hindsight to point out where trial counsel went awry in strategy. But trial tactics which terminate unsuccessfully do not automatically indicate ineffectiveness. So long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaninful [*sic*] representation, the constitutional requirement will have been met (see *People v Jackson,* 52 NY2d 1027; *People v Aiken,* 45 NY2d 394, *supra; cf. People v Bell,* 48 NY2d 933; *People v Droz,* 39 NY2d 457, *supra)."*

On the facts of this case, by either standard, counsel's representation cannot be deemed ineffective. Counsel represented defendant with reasonable competence. Much of the trial court's criticism addressed a trial strategy solely on the basis that it ultimately proved unsuccessful. Inadequate consideration is given in the Trial Judge's decision with respect to Natal's written statement to the police, his video taped statement to the Assistant District Attorney, his explanation to his family and the written statement given to counsel. Each emphasizes the robbery and accident aspects of Natal's version of the incident.

If he testified admitting Easterling's version of the events, he would have had to explain away all of these stories in a credible manner. In the face of the fact that these statements referred to his drinking that evening, he repeatedly insisted that he was in control of himself when he encountered Easterling and Suss.

Even if the intoxication defense had been further developed at trial, as the Trial Judge suggested, the jury still would have had to resolve the question of whether Natal's ability to form the requisite intent had been affected by alcohol. Evidence of his drinking was presented to the jury

by the defense and the prosecution. The jury was instructed regarding the intoxication defense. As triers of the fact, they apparently did not believe that the alcohol diminished his ability to form the intent to kill Suss. Moreover, if he changed his story, the intoxication defense would have to be weighed in the light of the statements in his video taped interview and statement to the police carefully recounting so many of the details preceding the shooting.

In reaching its decision, the court in effect ruled that defendant's attorneys should have adopted a different trial strategy, switching to a defense wholly inconsistent with all the statements defendant had given theretofore. A difference of opinion about strategy does not warrant the setting aside of defendant's conviction, even where the development of the strategy decided upon may leave something to be desired. Defendant is not entitled to perfect representation. Rather, he is entitled to a defense that does not render the trial a farce and a mockery of justice (see *People v Aiken,* 45 NY2d 394). Maintaining a strategy consistent with all of defendant's prior statements met the generally accepted standard of "reasonable competence" (*People v Baldi,* 54 NY2d 137, 146, *supra*). Defendant was most desirous of testifying on his own behalf. Had defendant radically altered his defense from one of justification to one of intoxication, it is plain that most of his time would have been spent on cross-examination explaining to the jury why he had lied about his involvement in this crime.

Nor are we convinced that intoxication was a viable defense here. The jury was given an opportunity to consider such a defense, and rejected it. It is unlikely that further development of this defense would have been fruitful, in light of evidence at the postjudgment hearing to the effect that defendant's mental faculties, even after several hours of drinking and smoking, were such as to permit the requisite capacity to form an intent to pull out a gun and cock the hammer. A forensic psychiatrist who testified at the hearing indicated that while the gun might have gone off accidentally because of drinking, defendant certainly was not impaired to the extent of affecting his capability of forming the intent to do that act. Defendant had consistently maintained to his attorneys that he had not been

drunk on the night of the incident. Thus, it was entirely reasonable for counsel to pursue a defense consistent with defendant's prior statements. Defendant was not deprived of his constitutional right to representation by counsel.

While the defense counsels' opening and summation were not the finest models of forensics, they did not prejudice the defendant. That the opening did not make clear that Natal would testify is not controlling. The opening suggested that one witness would be called to relate accurately what had occurred. The later decision to testify is not unique in criminal trials.

The implication by the Trial Judge that Matarazzo suborned perjury, by instructing the defendant to testify at the trial consistent with the robbery defense, is premised solely upon Natal's testimony at the posttrial hearing that he told Matarazzo the facts consistent with Easterling's testimony. The basis for the court's belief in the defendant's testimony does not appear. The fact that Matarazzo did not testify at the posttrial hearing hardly provides a foundation for such conclusion. There is no evidence in the record that Matarazzo was called as a witness by either side, or that he declined to testify. Guttman testified that he never heard Natal recant the robbery story or that Natal had so advised Matarazzo. Whatever the reason for the failure of either side to call Matarazzo at the posttrial hearing, it does not demonstrate either subornation or ineffective assistance of counsel.

Moreover, completely ignored in the posttrial decision setting aside the verdict is the crucial issue in the case. It stands admitted that, for whatever reason, Natal drew his loaded gun, cocked it and held it to the head of Suss. It is Natal's version that it somehow went off accidentally. The difficulty is that the jury just did not believe this claim of accident, on which the case turned. On this record, we find it equally difficult to believe. The determination was for the jury, not for the Trial Judge. This has nothing to do with ineffective assistance of counsel.

The record demonstrates that defense counsel vigorously participated in the trial by objecting to testimony and cross-examining Easterling. There was present the "reasonable competence" necessary to satisfy the Constitution

and not a "farce and a mockery of justice" (*People v Aiken, supra*).

Accordingly, the order appealed from should be reversed, on the law, the facts and in the exercise of discretion, the judgment of conviction and sentence should be reinstated and defendant directed to be remanded to custody.

MURPHY, P. J., SULLIVAN, BLOOM and MILONAS, JJ., concur.

Order, Supreme Court, New York County, entered on June 27, 1983, unanimously reversed, on the law, the facts and in the exercise of discretion, the judgment of conviction and sentence reinstated and defendant directed to be remanded to custody.