Pigott, J.
(dissenting). The majority holds that defendant was deprived of the effective assistance of counsel by looking at a single error in a vacuum, namely, alleged prosecutorial misconduct during summation to which defense counsel failed to object. However, we have long held that “ ‘[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met’ ” (People v Rivera, 71 NY2d 705, 708 [1988] [emphasis supplied], quoting People v Baldi, 54 NY2d 137, 146-147 [1981]). I write separately because I believe that defense counsel’s representation of defendant should be placed in its proper context and, viewed in its totality, defense counsel’s representation in this instance was light years from what is deemed ineffective assistance under our jurisprudence.
L
In this circumstantial case, defendant was convicted after a jury trial of one count of murder in the second degree (intentional murder), but was acquitted of murder in the second degree (felony murder) and rape in the first degree. The underlying facts, as proved at trial, were that the victim had last been seen in her car with defendant and another man, Christopher Gifford, in the evening hours of November 28, 1995. The next morning, she was found dead with a black ligature tied around her hands and neck. The defense conceded that defendant and the victim had engaged in sexual intercourse before she died, and that both defendant and Gifford had been in the victim’s car that morning. The only issue at trial therefore was the identity of the person(s) who allegedly raped and murdered the victim.
In addressing that issue, the People presented at trial test results from, among other things, swabs taken from both the *786 hand and neck ligatures and sperm samples taken from the victim’s underwear and vagina. Thus, we must assess defense counsel’s competence in attacking the test results that tended to implicate defendant, i.e., the samples taken from the hand ligature.
To prove their case, the People relied on a type of DNA testing called Y-chromosome analysis, or ‘YSTR testing.” According to the People’s expert, Meghan Clement, Technical Director of the Forensic Identity Testing Division at LabCorp, YSTR testing involves the analysis of male DNA when DNA samples consist of mixtures of both male and female DNA. This form of testing ignores female DNA and focuses exclusively on the male DNA. It allows the technician to distinguish how many males have contributed to a sample and whether the sample can be attributed to a specific male. When asked by the People to explain the process of YSTR testing, Clement testified as follows:
“The first thing that occurs is we add chemicals to the sample to break open the cell to allow the DNA to be released. We will then quantitate to determine approximately how much Y chromosome DNA we are able to recover from a portion of sample that we have used for testing. We then genetically photocopy the specific areas on the Y chromosome where there are differences between males and run it through a detection system to visualize the characteristics present in a particular sample. We use the same procedure for the unknown evidentiary sample as we do with a known reference sample and we simply compare the fields of the two samples to determine if there are similarities or differences.”
LabCorp created a chart from the samples subjected to the YSTR testing. The chart contained, among other things, a column depicting the reference profile that had been obtained from the oral swab sample taken from defendant. The chart also contained results that had been obtained from the swab samples taken from the hand ligature and the sperm samples taken from the victim’s underwear and vagina. Clement explained that, with regard to the hand ligature, she compared defendant’s and the victim’s husband’s reference profiles to the characteristics obtained from the ligature sample and determined that both were possible contributors to the mixture *787 sample, i.e., she could not exclude them as contributors. Clement explained that “[w]hat that means is that the characteristics seen within the mixture or characteristics possessed by that particular individual, and because characteristics that they possess are found within that mixture, we cannot exclude them as being possible contributors.”
Significantly, the proof at trial established that Clement excluded Gifford as a possible contributor to the hand ligature sample. With respect to the vaginal swab sample, however, Clement was unable to exclude defendant or Gifford. In addition, neither defendant nor Gifford were excluded as contributors to the sperm sample taken from the underwear.
Defense counsel ably attacked Clement’s testimony, getting her to admit that a number of men may possess similar characteristics to defendant and that she had obtained reportable results for only four of the 12 areas tested on the hand ligature. Certain of those areas, she conceded, had shown evidence of degradation, i.e., that the sample had “broken down,” so that she was able to obtain only what is known as a “partial profile.” During cross-examination, Clement admitted that she obtained only “a limited amount of information” from the hand ligature samples; she also acknowledged that it was “possible” that there could have been more than two contributors to the hand ligature.
Significantly, defense counsel asked Clement if she had conducted any statistical calculations with regard to the YSTR testing, and she responded in the negative. She explained that she engaged in an “accounting method” for that type of testing, but acknowledged that one could not “calculate statistics like we do with traditional, with nuclear or autosomal DNA testing” with YSTR. She further conceded that she could not give the jury a “statistical significance for the profile present in [the hand] ligature.” Perhaps the most damaging testimony that defense counsel elicited from Clement was that she could not state with a reasonable degree of scientific certainty that defendant’s DNA was on the hand ligature sample that she had tested.
Defense counsel was simply unrelenting at trial attacking not only YSTR analysis as a science, but also what the results ultimately showed. His attacks did not cease at the conclusion of the People’s case-in-chief, either. During his summation, he hammered away at Clement’s concessions that she could not *788 state with a reasonable degree of scientific certainty that the DNA on the hand ligature was defendant’s and that she could not provide any statistical analysis concerning the YSTR results.
IL
The critical error that defense counsel made, according to the majority and defendant, is that he did not object to certain statements that the prosecutor made during summation. To be sure, the prosecutor stated that defendant and Gifford “left their DNA all over the crime.” Viewing that statement in a vacuum, as the majority does, one could not draw any conclusion other than that defense counsel should have been on his feet, pounding the table and objecting to that statement. Viewed in context, however, that statement does little more than serve as an introduction to the prosecutor’s discussion of the DNA evidence. What was contained in her discussion? Statements that one “cannot put a statistical calculation on” YSTR DNA, and that the sperm fraction of the vaginal swab “matched the YSTR/DNA profile” of defendant and Gifford. The majority takes issue with the prosecutor’s use of the word “matched,” but when she utilized that word, it was to argue that the sample “matched” defendant’s YSTR DNA profile.
The majority claims that “the prosecutor aggressively argued the view that defendant’s DNA conclusively matched that found at the crime scene and on the victim” (majority op at 781), but that is simply not the case. The People did not misrepresent the evidence as the majority claims, but, rather, repeatedly argued that defendant’s YSTR DNA profile matched the DNA taken from the ligature:
“Probably the most or the piece of evidence that we, [defense counsel] and I, disagree on the most would be the DNA taken from the ligature that was binding [the victim’s] hands behind her back. . . . That ligature was wrapped and tied tight around her wrist. And what do we know about that? Were we able to get a complete profile? No. But at four locations there was able to be detected the presence of a Y chromosome, and this is something that you can go back and study, too. As you’ve heard during the testimony of LabCorp, each number represents an allele or a number assigned to that individual’s DNA at that particular Y location. The *789 ligature on the hands, every single number that they were able to determine, and they were able to detect partial profile matches, is that of [defendant] and [the victim’s husband]. She told you, because this is a partial profile and because the DNA on the ligature is a mixture, they are not able to give you a statistical calculation, but she can tell you, according to her expertise, that [defendant] could not be excluded as a contributor to the mixture on that ligature.
“Now, I want you also to look at the chart. Of the people that were with her that night, we have Christopher Gifford’s YSTR profile, Keith Milburn Evans’ YSTR profile, we have the Walker brothers’ profile. Remember, Christopher and Frederick Walker would have the same YSTR profile because they are brothers, and [defendant], we have got the YSTR profile, even throwing [the victim’s husband] in, they all have different profiles, all have different alleles at the locations. The only one that matches of the people that she was with that night, the only one who matches the DNA profile on the ligature is [defendant]. Is that a coincidence? I don’t think it is. Could it be transference? I don’t think it is. Could there be a reasonable explanation? I don’t think there is, and I don’t think I am asking you to take a leap of faith or to assume facts upon facts upon facts. You need to look at the ligature DNA profile in light of all of the other evidence that you have. Could there be a reasonable explanation for one thing? Sure. Could there be a reasonable explanation for two things? Sure. But what we have here, we have no reasonable explanation for [defendant’s] DNA on that ligature that bound her hands.
“In light of all of the other evidence, we have [defendant] and his codefendant with her hours before her body was discovered. [The victim’s husband] wasn’t there. We had [defendant] and Christopher Gifford together alone hours later. We have them alone in her car before her body is discovered. We have [defendant] showing [the victim’s] car to Keith Evans. We have [defendant’s] sperm in [the vie *790 tim’s] vagina. We have [defendant’s] sperm on [the victim’s] underwear, and we have [defendant’s] DNA profile included on the ligature that bound her hands together, the same identical ligature that is around her neck and strangled her to death. When you look at all of that, there is no reasonable explanation other than the fact that he and Christopher Gifford took her in that car, tied her up, raped her, strangled her, dumped her on Skuse Street, and got on with their own business.
“This is a case of common sense and science. [The victim] didn’t deserve to die that way. She was a drug addict. She got herself into a bad situation, but it doesn’t escape the facts. The Defendant’s DNA is inside her, on her underwear, on the ligature that binds her hands. He is seen with her while she is alive before her body is discovered. He is seen with Christopher Gifford afterwards driving around in her car, and he points out her car to another friend, bragging about it being parked on Burbank Street. When you put it all together, members of the jury, it is common sense and there is only one conclusion that you can reach, and that is guilty. Thank you” (emphasis supplied).
It is irrelevant that the prosecutor referred to defendant’s DNA being inside the victim or on her underwear; the defense conceded during opening statements that defendant had been with the victim and had engaged in intercourse with her, so there was no point in defense counsel objecting to that part of the prosecutor’s statement. Moreover, defense counsel, proving his effectiveness, actually got defendant acquitted of the first-degree rape and felony murder counts. The jury plainly rejected the People’s theory that defendant raped the victim. When the rape charge fell, so too did the felony murder charge which was premised on the rape charge.
The People carefully explained to the jury that they were not able to obtain a complete profile or a statistical calculation. Essentially, the People’s summation acknowledges that they believed that their YSTR DNA evidence was relatively weak, which explains why the prosecutor told the jury that “[t]his is a case of common sense and science.” The prosecutor did not represent the YSTR DNA evidence as a “slam dunk,” but, rather, asked the jury to “put it all together” and “to look at the *791 ligature DNA profile in light of all of the other evidence that you have” (emphasis supplied). Indeed, the People had more than just the YSTR DNA results tying defendant to the crime. They also had the testimony of two eyewitnesses who saw defendant and his accomplice with the victim hours before she died, and testimony from one of those witnesses that defendant had taken him to where the victim’s car was parked just one day after the victim was found dead. The YSTR DNA profile evidence was just one piece of the puzzle. The prosecutor knew that. Defense counsel knew that. And the jury knew that, too, based on both the proof presented at trial and defense counsel’s effective cross-examination of Clement.
This is not a case where the People misrepresented the DNA evidence as being more important and powerful than it actually was. The People did not pursue a theory that this type of DNA evidence statistically identified defendant as the perpetrator. Indeed, the prosecutor was careful to explain the limitations of the YSTR DNA evidence that was presented. Essentially, what the majority does is take two throwaway lines by the prosecutor, one made at the beginning of the discussion of the DNA evidence and one at the end, and ignores the prosecutor’s thorough explanation of the evidence that is sandwiched in between the two. There is a reason why defense counsel did not object: when the two damaging statements are viewed in the context of the prosecutor’s overall summation, there was simply no need for him to register an objection. His silence in that regard did not somehow “negate” his competent representation up until that point.
The alleged ineffectiveness in this case is significantly weaker than counsel’s ineffectiveness in People v Fisher (18 NY3d 964 [2012]). In that case, which involved child molestation allegations against the defendant, “the prosecutor improperly encouraged inferences of guilt based on facts not in evidence” by arguing during summation that the two alleged child victims had “ ‘said the exact same thing over and over and over again’ ” to police, social workers and others when there was no evidence to that effect, thereby bolstering their testimony {id. at 966). The prosecutor also asked the jury to infer that the children’s acting out at school supported the abuse allegations (see id.). Further, the prosecutor minimized her influence over the benefit that was to be bestowed upon the jailhouse snitch who testified that the defendant had made incriminating statements while incarcerated {see id. at 967). *792 And, during summation, the prosecutor pleaded to the jury that “ ‘[t]he voice of a child is evidence, the testimony of two children is evidence. The day that the voice of a child is not evidence is the day that those doors [the doors to the courtroom] should be locked forever’ ” (id.). Defense counsel did not object to any of these improprieties, and we held that his failure to do so deprived the defendant of his right to the effective assistance of counsel (see id.).
Unlike the situation in Fisher, where errors occurred not just during the People’s case-in-chief but also during summation, the majority’s real problem with defense counsel’s representation in this case is his failure to object to the prosecutor’s statements during summation. But, as evidenced from the overall context of that summation, there was no misrepresentation of the DNA evidence at all. To claim otherwise is a disservice to defense counsel, who ably cross-examined Clement, obtained damaging concessions from her, and persuaded the jury to acquit defendant on two of the three counts in the indictment. A cursory review of the prosecutor’s summation statements does not paint a picture of a rogue prosecutor attempting to mislead the jury by misrepresenting the evidence presented, nor does it paint a picture of a defense counsel sitting idly by while the prosecutor spins a deceitful web.
The majority concedes that, up until the prosecutor’s summation, defense counsel had undertaken “a rather effective defense strategy of identifying the weaknesses of the DNA evidence” (majority op at 783). By this, what it really means is that this is one of those “rare” cases where “a single failing in an otherwise competent performance is so ‘egregious and prejudicial’ as to deprive [this] defendant of his constitutional right” (People v Turner, 5 NY3d 476, 480 [2005], quoting People v Ca-ban, 5 NY3d 143, 152 [2005]; Murray v Carrier, 477 US 478, 496 [1986]).
The majority claims that defense counsel’s failure to object to the prosecutor’s alleged objectionable statements evidenced “multiple failures, different in kind from that identified in . . . Turner” (majority op at 784), but simply calling something “multiple failures” does not make it so. The one mistake defense counsel allegedly made, and the one mistake cited by the majority as a basis for its reversal, is that defense counsel failed to object to the prosecutor’s alleged mischaracterization of the evidence. Indeed, even the Appellate Division dissenters deemed defense counsel’s alleged failure to object to be a “single *793 error” that “was so egregious and prejudicial that defendant did not receive a fair trial” (115 AD3d 1257, 1262 [4th Dept 2014]). If the majority wishes to extend Turner to an alleged single mistake made by counsel during summation, it should expressly do so rather than utilizing phrases like “serial failure to object” (majority op at 779) and “multiple failures” (majority op at 784) in order to justify the result it reaches in this appeal.
Viewing defense counsel’s representation in its totality, as we must, it is evident that defendant was afforded his constitutional right to effective assistance of counsel, and I would therefore affirm the order of the Appellate Division.
Chief Judge Lippman and Judges Read, Abdus-Salaam and Stein concur; Judge Pigott dissents in an opinion; Judge Fahey taking no part.
Order reversed and a new trial ordered.