People v Trappler (2019 NY Slip Op 04781)





People v Trappler


2019 NY Slip Op 04781


Decided on June 13, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 13, 2019

106227

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
ALICE C. TRAPPLER, Appellant.

Calendar Date: April 25, 2019

Before: Lynch, J.P., Clark, Devine, Aarons and Pritzker, JJ.


Thomas J. Eoannou, Buffalo, for appellant, and appellant pro se.
Joseph G. Fazzary, District Attorney, Watkins Glen, for respondent.



MEMORANDUM AND ORDER
Lynch, J.P.
Appeal from a judgment of the County Court of Schuyler County (Morris, J.), rendered July 25, 2013, upon a verdict convicting defendant of the crimes of murder in the second degree (two counts), burglary in the first degree, burglary in the second degree and conspiracy in the second degree.
On November 2, 2011, defendant gave birth to a child fathered by her ex-boyfriend, Daniel Bennett (hereinafter the victim). Defendant was opposed to the victim having any contact with the child and so confided in her ex-husband, Thomas Borden. On the evening of April 19, 2012, Borden and his stepbrother, Nathan Hand, went to the victim's residence, where Borden entered the home and fatally shot the victim using a 12-gauge shotgun. Two days later, while being pursued by police in Pennsylvania, Borden jumped in front of a commuter train and was killed. After being taken in for questioning, Hand admitted that he was with Borden and aided him in killing the victim.
In June 2012, defendant was charged in a five-count indictment with two counts of murder in the second degree, burglary in the first and second degrees and conspiracy in the second degree, all based on a theory of accessorial liability in the shooting of the victim. After a two-week jury trial, defendant was convicted as charged. County Court denied her motion to set aside the verdict pursuant to CPL 330.30 and ultimately sentenced her to an aggregate prison term of 25 years, with five years of postrelease supervision. Defendant appeals.
As defendant failed to challenge the legal sufficiency of the evidence at the close of all the proof, her legal sufficiency claim is not preserved for our review (see People v Lane, 7 NY3d 888, 889 [2006]). That said, our weight of the evidence review necessarily includes an evaluation of whether all the elements of the charged crimes were proven beyond a reasonable doubt (see People v Danielson, 9 NY3d 342, 348-349 [2007]). Accepting that a different result would not have been unreasonable in view of defendant's testimony disavowing any knowledge of Borden's plan to shoot the victim, we weigh the conflicting testimony as to what transpired [*2]and independently assess the inferences to be drawn, giving due deference to the jury's credibility determinations (see People v Bleakley, 69 NY2d 490, 495 [1987]).
There is no real dispute here that Borden entered the victim's home and fatally shot him, establishing the fundamental acts underlying the murder and burglary charges (see Penal Law §§ 125.25 [1], [3]; 140.30 [1]; 140.25 [2]). The pivotal question is defendant's role in this unprovoked attack. Pertinent in this regard is that a person is guilty of conspiracy in the second degree when, "with the intent that conduct constituting a class A felony be performed, [he or she] agrees with one or more persons to engage in or cause the performance of such conduct" (Penal Law § 105.15; see People v Nicholas, 118 AD3d 1183, 1185 [2014], lvs denied 24 NY3d 1121, 1122 [2015]). As relevant to accessorial liability, "[w]hen one person engages in conduct which constitutes an offense, another person is criminally liable for such conduct when, acting with the mental culpability required for the commission thereof, he [or she] solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct" (Penal Law § 20.00; see People v Williams, 156 AD3d 1224, 1226 [2017], lv denied 31 NY3d 1018 [2018]; People v Strauss, 155 AD3d 1317, 1318 [2017]).
The record shows that defendant's relationship with the victim lasted from about January 2011 into May 2011, and that it was established after the shooting that he was the child's biological father. That said, defendant characterized the victim as a "monster" and told numerous witnesses, including the victim's parents, that she would never allow him to see the child. She confirmed asking three other males to acknowledge paternity, which Borden eventually agreed to do. The victim's father testified that the victim was trying to establish his paternity of the child [FN1]. The victim's father also testified that defendant had been to his home on numerous occasions and knew that the victim never locked the door and slept on the couch. Defendant's employers, Larry Knowles and Janice Knowles, both testified that defendant was very upset in the days leading up to the paternity proceeding and was fearful for the child's safety. When defendant showed up for work on April 20, 2012, Larry Knowles advised her that the matter was serious and that he hoped she had a good alibi, to which defendant responded, "I have a good one." Janice Knowles testified that when defendant came into work that morning, she stated, "Does anybody have any questions?" and then said "that [the victim] was a monster, but this didn't need to happen, that she had all her ducks in a row, she was going to win [the paternity case] today." The record further shows that Borden shot the victim with a 12-gauge Mossberg shotgun. Brett Bacon, defendant's coworker, was in a relationship with defendant and had given her the Mossberg shotgun after the baby was born. Bacon had previously given defendant a shotgun at her request.
For his part, Hand testified that he initially understood that he and Borden were going to the victim's home on the evening of April 19, 2012 to beat him up. Hand testified that Borden knew from defendant that there was an alarm on the porch, that the front door was always unlocked and that the victim slept on the couch. As the evening progressed, Hand inquired as to when they would approach the victim's house, to which Borden responded "that he was waiting for a phone call" from defendant. After 9:00 p.m., Borden received a call from defendant, who advised that the victim had been fishing and would be awake so they had to "wait a little." Shortly thereafter, Borden told Hand that he was going to kill the victim and showed him the shotgun. When they arrived at the victim's house, they approached from the side of the porch to avoid the alarm on the steps, and opened the unlocked door to find the victim sleeping on the couch. Borden went in and fired the fatal shot, leaving a shell casing behind. They quickly left the scene, purchased a shovel at a nearby Walmart and buried the shotgun in an area that Hand knew of near Pinnacle State Park. During the ensuing investigation, the shotgun was recovered and identified by Bacon as the Mossberg shotgun that he had given to defendant. The shell casing matched the ammunition that defendant had purchased at Walmart earlier in the evening. A forensics investigator testified that it looked like someone had filed away the serial number. [*3]Correspondingly, the record indicates that defendant purchased a file at a Home Depot around 5:00 p.m. on April 19, 2012.
There are further incriminating factors, including a series of text messages between defendant and Borden in the days and hours leading up to the shooting. Text messages between defendant and Borden on April 13, 2012 showed that defendant expressed concern about witnesses backing out due to "fear of retaliation," with Borden reassuring her that there would be no hearing. On April 17, 2012, Borden wrote, "I just want u [sic] to no [sic] that we're gonna pull this off I have faith." The text messages began early on the morning of April 19, 2012, with Borden writing at 6:00 a.m. that he would stop by to get "that thing u [sic] offered me" and a short time later cautioning defendant to "get rid of that box." Shortly before 8:00 p.m., defendant texted Borden that the victim was staying at his father's house. By 9:10 p.m., Borden texted defendant, "Call me now" and, by 9:31 p.m., Borden advised defendant that "watching tv now mayb [sic] asleep in an hour." Defendant responded, "Think we should stop txting [sic] . . . towers traceable??" At 11:17 p.m., Borden advised defendant that he was "just leaving work." The next morning, at 4:26 a.m., Borden wrote, "I think we are ready for whatever he brings to court," to which defendant replied, "Wonder if he will show up this time lol." This sequence demonstrates that there was a plan in place that was accomplished in advance of the paternity hearing. Notably, a forensics investigator testified that defendant and Borden deleted most of these messages from their phones, but the investigators were able to have the messages retrieved. There was also evidence that defendant made numerous jailhouse phone calls asking her parents to speak to Bacon, stating, "It could be my demise" if they did not calm him down. Considering the cumulative evidence set forth above, and giving due deference to the jury's credibility assessments, we find that the verdict accords with the weight of the evidence.
Next, defendant maintains that County Court erred in allowing Hand to testify as to statements made by Borden on the evening of April 19, 2012. The objection came after Hand testified that Borden said that he was waiting for a phone call and the follow-up question was asked, "Waiting for a phone call from who?" — to which Hand responded, from defendant. In our view, County Court properly overruled the objection and allowed the testimony under the coconspirator exception to the hearsay rule (see People v Berkowitz, 50 NY2d 333, 341 [1980]; People v Salko, 47 NY2d 230, 237-238 [1979]; People v Cancer, 16 AD3d 835, 839 [2005], lv denied 5 NY3d 826 [2005]). Under this exception, "any declaration by a conspirator made during the course of and in furtherance of the conspiracy is admissible against a coconspirator as an exception to the hearsay rule" (People v Salko, 47 NY2d at 237). To admit such evidence, a prima facie case of conspiracy must first be established "without recourse to the declarations sought to be introduced" (id. at 238). In our view, given the proof as outlined above and without considering the statements that Borden ostensibly made to Hand on the evening of April 19, 2012, County Court correctly determined that the People did establish a prima facie case of conspiracy sufficient to admit Hand's testimony as to Borden's statements.
As to defendant's remaining contentions, we find that County Court properly denied defendant's CPL 330.30 motion to set aside the verdict based on an unsubstantiated jury misconduct claim. Defendant's challenge to the court's jury charge was not preserved by an appropriate objection (see People v Becoats, 17 NY3d 643, 650 [2011]). Finally, viewing the record in totality, we are satisfied that defendant received the effective assistance of counsel (see People v Baldi, 54 NY2d 137, 147 [1981]).
Clark, Devine, Aarons and Pritzker, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: A paternity hearing was scheduled in Family Court on April 20, 2012, the day after the victim's murder.