■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RALPH J. TORTORICI, Appellant. [671 NYS2d 162] —Carpinello, J. Appeal from a judgment of the County Court of Albany County (Rosen, J.), rendered February 16, 1996, upon a verdict convicting defendant of the crime of assault in the first degree, kidnapping in the second degree (four counts), reckless endangerment in the first degree (four counts), criminal use of a firearm in the first degree and criminal possession of a weapon in the fourth degree.

On the morning of December 14, 1994, defendant took a group of students hostage in an underground lecture center on the campus of the State University of New York at Albany. He was armed with a hunting knife, a recently purchased semiautomatic rifle and over 80 rounds of ammunition. During the two-hour standoff, precipitated by defendant's belief that he was the subject of a government experiment and had been unfairly prevented from graduating, defendant demanded the presence of, among others, various University and public officials and threatened to kill the students if his demands were not met.

At one point, defendant, believing the negotiations to be at an impasse, fired the rifle through a projection screen located in the front of the room "to get attention". He was finally subdued by the collaborative efforts of several students. The struggle, however, was not without consequences as two students were injured—one rendered sterile by a shot in the thigh and scrotum when defendant discharged the rifle and another received superficial knife wounds; defendant himself sustained a knife wound to his right hand.

Following an evaluation to determine his fitness to stand trial (see, CPL 730.30), defendant was found unfit to proceed and committed to Mid-Hudson Psychiatric Center in Orange County where he remained from January 6, 1995 through March 20, 1995. According to the Mid-Hudson discharge records, defendant's diagnosis was alcohol abuse, cocaine-induced psychotic disorder with delusions and paranoid personality disorder. Nevertheless, his condition was considered improved and he was certified as fit to proceed to trial.

A 15-count indictment was handed up against defendant on March 7, 1995; he was arraigned on March 20, 1995 and a suppression hearing ensued on November 16, 1995. At the suppression hearing, as well as at the commencement of jury selec-

tion on January 3, 1996, defendant expressed his desire to be absent from the proceedings. On both occasions, County Court, after questioning defendant and his attorney about his waiver of the right to be present, satisfied itself that such waiver was knowingly made.

The jury found defendant guilty of assault in the first degree, four counts of kidnapping in the second degree, four counts of reckless endangerment in the first degree, criminal use of a firearm in the first degree and criminal possession of a weapon in the fourth degree. He was sentenced to concurrent prison terms of $8^{1/3}$ to 25 years on each kidnapping conviction, $2^{1/3}$ to 7 years on each reckless endangerment conviction, $12^{1/2}$ to 25 years on the criminal use of a firearm conviction and one year on the criminal possession of a weapon conviction. He was also sentenced to a consecutive prison term of 5 to 15 years on the assault conviction.

On the evening of January 4, 1996, a court-ordered evaluation was conducted of defendant by Lawrence Siegel, a forensic psychiatrist retained by the People to ascertain whether he was legally responsible for the charged crimes (*see*, CPL 250.10 [3]). The evaluation lasted one hour following which Siegel expressed doubts about defendant's capacity to stand trial. The primary contention advanced by defendant on appeal is that County Court's failure to *sua sponte* order a competency hearing following Siegel's evaluation warrants reversal of the judgment.

Upon our review of the proceedings both prior to and following Siegel's examination, as well as the pertinent medical documents in the record, we conclude that County Court did not abuse its sound discretion—the standard this Court is obligated to apply (*see*, *People v Morgan*, 87 NY2d 878; *People v Dover*, 227 AD2d 804, 805, *lv denied* 88 NY2d 984)—in failing to *sua sponte* conduct a competency hearing after defendant had previously been certified fit to proceed to trial.

The fitness-to-proceed test is whether defendant is able to understand the nature of the charges against him and capable of assisting in his own defense (*see*, *People v Dover, supra*; *People v Rogers*, 163 AD2d 337, *lv denied* 76 NY2d 943; *People v Gronachan*, 162 AD2d 852, 853). In making this determination, County Court must take into consideration available expert medical proof "coupled with all other evidence and [its] own observations of the defendant" (*People v Gensler*, 72 NY2d 239, 244, *cert denied* 488 US 932). Significantly, the determination of fitness to proceed to trial is a judicial one, not a medical one (*see*, *People v Gensler, supra*, at 244).

Applying these principles to this case, we address first the contents of Siegel's report for, in our view, many of his findings, although qualified, themselves satisfy the legal standard of fitness to proceed.[1] The report indicates that many questions asked of defendant were answered responsibly and appropriately (this was confirmed by defense counsel who was present for the evaluation). According to Siegel, defendant was alert and oriented as to date, place and time during the one-hour session. Significantly, defendant demonstrated to Siegel that he possessed *"more than a rudimentary understanding of the process of trial and the roles of the Judge, jury, prosecutor and defense attorney"* (emphasis supplied). Indeed, Siegel himself notes that "[m]uch of [defendant's] communication regarding his legal situation makes sense. He is aware of the names of the charges against him and has an understanding of what he is alleged to have done". The report further details that defendant is capable of forming a relationship with his attorney, "appears to have formed one" and is able to consider his attorney's advice.

Undeniably, Siegel's written report contains many qualifying statements referring to behavior on defendant's part which demonstrates a disturbed individual suffering from a mental illness.[2] A diagnosis of mental illness, however, does not in and of itself equate with unfitness to stand trial. Thus, despite Siegel's *medical* opinion that defendant was not fit to proceed, the report itself contains some evidence indicating that, from a *judicial* standpoint, defendant was competent to proceed as he was able to understand the nature of the charges against him and assist in his own defense (*see, People v Gensler, supra*).

Upon learning of Siegel's opinions, County Court took affirmative steps to address the issue through detailed inquiries on two separate occasions. On January 5, 1996, the prosecution orally notified County Court and defense counsel of Siegel's doubts concerning defendant's fitness to proceed. At this time, the prosecution informed the court, however, that "a review of the jail records, mental health records * * * *would not in any way contradict the fact that [defendant] appeared at all times*

---

**1.** While not determinative, it is important to reiterate that the purpose of the court-ordered evaluation by Siegel was not to determine defendant's fitness to stand trial; rather, it was to ascertain whether he was legally responsible for the charged crimes.

**2.** In making its determination to proceed, County Court possessed the multitude of psychiatric records concerning defendant and was obviously well aware of the mental illnesses with which he had been diagnosed.

*fit to proceed as of yesterday*" (emphasis supplied).[3] Defense counsel informed the court that he attended the entire Siegel evaluation during which defendant was able to appropriately respond to "time, date, place [and] orientation type questions". He further represented to the court that, notwithstanding the obvious mental illness from which defendant suffers, "*we* are ready to proceed with the defense" (emphasis supplied). Contrary to the dissent's contention, such statements indicate that defense counsel was not silent on the issue of whether a competency hearing should be held.

County Court then discussed its recent observations of defendant. Despite Siegel's findings, the court's "progressive personal observations of defendant" (*People v Gensler*, 72 NY2d 239, 245, *supra*) between March 20, 1995 (the arraignment), November 16, 1995 (the suppression hearing) and January 3, 1996 (the commencement of trial) demonstrated to it that defendant was able to understand the nature of the charges against him and assist in his own defense. Thus, the court ruled that it was unnecessary to *sua sponte* "review the expert determination made by the psychiatrists of Mid-Hudson".

The issue was revisited again four days later when the prosecution turned over Siegel's written report to County Court and defense counsel. At this time, County Court *again* thoroughly reviewed the issue with counsel and both the prosecution and defense counsel indicated that they were ready to proceed. Defense counsel also added for the record that defendant never refused to complete the evaluation; rather, it was terminated by Siegel. Defense counsel further stated that, while the first several minutes of the session with Siegel were "a little rough", the remainder proceeded without any real difficulty. Again, we reiterate that defense counsel was not silent on this issue. County Court reaffirmed its prior decision to continue with the trial.

With the obvious exception of the one-hour meeting with Siegel, there is no other evidence in the record that defendant, although undoubtedly suffering from mental infirmities, exhibited any behavior following his discharge from Mid-Hudson— either inside or outside the courtroom—which would suggest

---

**3.** Evidence adduced at trial supports this representation. Defendant's own expert witness, James Thalmann, a psychologist who evaluated defendant during the summer of 1995 and reviewed his jail records, testified on cross-examination that defendant "was able to coherently discuss the status of his [legal] case" and was optimistic of his chances to negotiate a favorable plea bargain. On redirect, Thalmann opined that the significance of defendant's ability to understand the legal process was that "he was competent to proceed".

that he was no longer fit to proceed to trial. In addition to evidence that defendant exhibited no behavior at the jail between March 20, 1995 and January 4, 1996 calling into question his fitness to proceed with trial and County Court's own observations of him during this same time period, the court also took into consideration defense counsel's position on this matter.

In this vein, we note that defense counsel made repeated and unequivocal assurances to County Court that, notwithstanding Siegel's opinion, defendant was ready to proceed. Defense counsel's role in assessing his own client's capacity, while certainly not dispositive, cannot be overemphasized (see, *People v Gelikkaya*, 84 NY2d 456, 460). Notably, following defendant's discharge from Mid-Hudson, defense counsel, "who was in the best position to assess defendant's capacity" (*id.*, at 460), never raised the issue of his fitness to proceed, even after attending Siegel's evaluation and twice discussing his findings in open court. Indeed, in a December 27, 1995 letter to County Court concerning defendant's desire to waive his right to be physically present in the courtroom during the trial, defense counsel states: "Please be advised that I have fully informed my client of the nature of his right to be present at trial, as well as the consequences of allowing the trial to proceed in his absence. *Once again, my client acknowledged his understanding of the process* and further directed me to proceed, in absentia, with the presentation of the defense" (emphasis supplied). Inherent in such affirmative representations and assurances to the court is that defense counsel engaged in meaningful discussions with defendant and had no reason to question his competency.[4]

In view of all "the available information" (*People v Armlin*, 37 NY2d 167, 171) before the court and "credit[ing] all the * * * factors weighed by [it]" (*People v Morgan*, 87 NY2d 878, 880, *supra*), we are unable to conclude that County Court abused its discretion in not choosing to *sua sponte* conduct a competency hearing concerning defendant's capacity to stand trial.

We also reject defendant's contention that defense counsel's

---

4. To this end, we further note that such representations continued throughout the trial. *Every day* of the eight-day trial, County Court began the proceedings (in the absence of the jury) by inquiring of defense counsel whether he had conferred with his client and whether his client had reconsidered his decision to be absent during trial. *Every day*, defense counsel's response was essentially the same: "Once again we have elected jointly to continue the trial with [defendant] being in absentia." Such representations could not have been made without defense counsel having engaged in meaningful dialogue with his client.

failure to request a competency hearing rendered him ineffective. Upon our review of the entire record in this matter, we find that defense counsel put forth a superlative defense on defendant's behalf. Not only did he mount an effective, albeit unsuccessful, defense regarding defendant's mental capacity to commit the crimes by presenting the testimony of no less than four psychiatric experts, he successfully obtained acquittals on three counts of attempted murder. In short, there is no doubt that defendant received not only meaningful legal representation, but exceptional legal representation (*see, People v Baldi*, 54 NY2d 137), as well as the benefit of a trial court which was scrupulous in its devotion to the conduct of a fair trial.

White and Peters, JJ., concur.

Spain, J. (dissenting). While we have no doubt that the crimes here are most egregious and the evidence of guilt in the record is overwhelming, neither the nature of the crimes nor the quantum of proof is at issue. The issue on appeal distills to whether County Court took sufficient steps to ensure that an incompetent person was not put on trial. Because we believe that County Court did not, we respectfully dissent.

"It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial" (*Drope v Missouri*, 420 US 162, 171). Although the determination as to whether to order a competency hearing is left to the discretion of the trial court, the court has an obligation to issue an order of examination when there is a reasonable ground for believing that defendant is an incapacitated person (*see, People v Armlin*, 37 NY2d 167, 171; *People v Smyth*, 3 NY2d 184, 187; *People v Dover*, 227 AD2d 804, 805, *lv denied* 88 NY2d 984; *People v Simmons*, 182 AD2d 1018, 1019; *see also*, CPL 730.10 [1]; 730.30 [1]); this obligation exists "whether or not counsel raised the issue" (*People v Bangert*, 22 NY2d 799, 800). While there is a presumption of competency (*see, People v Gelikkaya*, 84 NY2d 456, 459-460), the presumption is rebutted by evidence that defendant is not fit to proceed (*see, id.*, at 460).

We have no quarrel with the majority's assertion that a determination of fitness is a judicial, not a medical inquiry. However, we are not aware of a single reported case where a competency determination was made without the benefit of medical opinion and, in the few reported cases that have found competency in the face of uncontroverted medical evidence to the contrary, that determination was based upon the trial

court's "progressive personal observations" of the defendant (*see, e.g., People v Gensler*, 72 NY2d 239, 245). In this regard, it is important to note that, contrary to the majority's assertion, there were no such progressive personal observations by County Court here, and it is this aspect of the case that we find most troublesome.

The record reveals that subsequent to defendant's arraignment on March 20, 1995, County Court observed defendant on November 16, 1995 at the beginning of a *Mapp-Huntley* hearing. Defendant, through his defense counsel, had previously indicated his desire not to be present at such hearing. County Court had defendant brought into the courtroom and inquired whether his counsel had spoken with him regarding his "personal presence being dispensed with at this pre-trial hearing", to which defendant responded, "I do not desire to be present. No further comments." County Court then proceeded in defendant's absence, and there is nothing to reflect any further "progressive personal observations" (*People v Gensler, supra*, at 245) until the commencement of trial on January 3, 1996, when defendant again expressed his desire to be absent. At that time County Court asked defendant upwards of six questions, related to his understanding of the significance of waiving his right to be present during the proceedings. Beyond those questions, and the extremely terse answers in response thereto, County Court had no other personal contact with defendant throughout this trial.

Although County Court did indeed consult with defense counsel at the beginning of each day's session as to whether defendant continued to desire to be tried in absentia, this cursory inquiry sheds no light on defendant's mental capacity to proceed. And to the extent that the majority relies upon the failure of defense counsel to raise the issue of defendant's fitness to proceed as affirmative evidence of fitness, we strongly disagree. In our view, neither defense counsel's "repeated and unequivocal assurances to County Court that * * * defendant was ready to proceed" nor counsel's failure to raise the issue of fitness to proceed may serve to obviate the need for a *sua sponte* inquiry by the court (*see, People v Bangert*, 22 NY2d 799, 800, *supra*). If counsel's representations or silence could be construed as conclusive evidence of competency, the court's obligation to inquire would be rendered meaningless.

With respect to the majority's statement that County Court had before it evidence that defendant exhibited no behavior at the jail between March 20, 1995 and January 4, 1996 which may have called into question his fitness to proceed, we find no

such evidence in the record as of the time County Court determined that an inquiry was not necessary. What the record does reflect is that on January 5, 1996, the prosecutor advised the court that "a review of the jail records * * * would not in any way contradict the fact that [defendant] appeared at all times fit to proceed as of yesterday". As noted previously, however, the prosecutor's representations cannot serve as a substitute for County Court's duty to exercise its discretion in determining competency (*see, People v Morgan*, 87 NY2d 878, 880). Simply stated, this is not a case where the trial court was justified in reaching a competency determination based upon its observations of the defendant actively participating in the case, including a continuing flow of oral communications with the defendant's attorney and the personal interaction between the trial court and the defendant throughout the course of the trial (*compare, People v Morgan, supra*, at 880). At the time County Court was informed of Lawrence Siegel's psychiatric report, the court's contacts with defendant had been minimal.

Next, with respect to the Siegel report, it is the emphasis put upon such report by the majority that represents the crux of the problem. Ignoring Siegel's opinion that, with a reasonable degree of psychiatric certainty defendant was not fit to proceed to trial due to acute psychosis, the majority focuses upon that portion of the report which observes that defendant possessed "more than a rudimentary understanding of the process of trial and the roles of the Judge, jury, prosecutor and defense attorney" and concludes that defendant was capable of forming a relationship with his attorney and appeared to have done so.* It is significant that the reports of the two doctors who conducted CPL 730.20 examinations of defendant after his arrest in 1994 also observed that defendant had a full understanding of the proceedings, the role of the Trial Judge, the District Attorney and his own attorney. Nevertheless, like Siegel, they were of the opinion that defendant's understanding was tainted by his delusional system and, therefore, lacked the capacity to understand the proceedings and to assist in his defense. Based upon those reports, the same Judge initially found defendant to be incapacitated. As a review of those

---

* The majority fails to note that the report continues, with regard to defendant's understanding of the trial process, that "this understanding is tainted by his conviction that there are external governmental forces influencing these persons through waves". Notably, with regard to defendant's relationship with his defense counsel, the report continues: "While he is capable of forming a relationship with his attorney (and appears to have formed one), his delusional system is such that there cannot be a joint understanding of the meaning of the trial currently going on."

reports and Siegel's report produces a near mirror image with regard to findings and opinion, it is curious that when, confronted with Siegel's report, County Court did not feel the need to hold a competency hearing.

In short, what County Court had before it in January 1996 was psychiatric evidence that by January 1995 defendant suffered from a psychotic delusional disorder which rendered him unfit to stand trial and that two months later, in March 1995, apparently after extensive psychiatric treatment, defendant was certified by the psychiatrists at Mid-Hudson Psychiatric Center as being fit to proceed based upon defendant's awareness and appreciation that his thought process was delusional. Then, 10 months thereafter, apparently without the benefit of additional psychiatric treatment, medical evidence surfaced in the form of Siegel's report that defendant again was suffering from a psychotic delusional disorder which rendered him unfit to proceed. Given that sequence of events, County Court surely should have surmised that defendant's mental state may have deteriorated during that 10-month period and should have held a hearing *sua sponte*, regardless of whether defense counsel raised the issue. Siegel's report, which represented the most current and updated psychiatric observations and evaluation of defendant, together with defendant's extensive psychiatric history, provided reasonable grounds for doubting defendant's competency (*see, People v Armlin*, 37 NY2d 167, *supra*).

In view of the foregoing, we would withhold determination of this appeal and remit the matter to County Court for a reconstruction hearing, at which the People would have the burden of proving that defendant was competent at the time of the trial and sentencing (*see, People v Wright*, 105 AD2d 1088).

Crew III, J. P., concurs. Ordered that the judgment is affirmed.

