[729 NYS2d 121]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DANIEL GIL, Appellant.

First Department, August 16, 2001

### APPEARANCES OF COUNSEL

*John M. Moreira* of counsel (*Joseph N. Ferdenzi* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

*Eunice C. Lee* of counsel (*Richard M. Greenberg, Office of the Appellate Defender,* attorney), for appellant.

### OPINION OF THE COURT

Per Curiam.

The question before us is whether defense counsel's conduct in proceeding to trial in this case on the date of defendant's arraignment on a multi-felony indictment without any prior investigation and after waiving all pre-trial motions and discovery denied defendant effective assistance of counsel.

The facts as presented by the People's witnesses indicated that at 9:10 P.M. on April 22, 1995, Abdoulaye Balde was backing out of the garage of a building in which he lived on Lacombe Avenue in the Bronx when two cars blocked him in. Four men, including defendant, emerged from the cars and told Balde that they were undercover police officers, and one of them showed him a badge. Two others held guns. Defendant took Balde's keys, pulled him out of his car and handcuffed him. Another man parked Balde's car on the street. They all went up to Balde's apartment, which he shared with Mamadou Conte and Ibrahim Diallo, where they threw Balde down and, identifying themselves as police officers, tied up and hit Diallo. They asked for "the money" and took $30 from Balde and $117 from Diallo. According to the complainants, defendant, who had a gun and who threatened to kill them, gave the orders to the other men. Defendant learned from Diallo that a red BMW parked outside belonged to his cousin, Conte, who had gone to pick up some friends. When Conte returned to the apartment with his friends, defendant and the other men put a gun to his head and said they were police officers. Then they tied up Conte and one of his friends, stomped on the friend's head and took his money, jewelry and car keys. Defendant took Conte's car keys, wallet and jewelry. Two of the men took Balde and the women who had arrived with Conte into another room and tied

them up, and one put Conte in the closet. The men left the apartment at about 11:30 p.m. The complainants called the police and met them outside, where Balde saw one of the cars, a burgundy Toyota Camry, with which the men had blocked his car at the beginning of the evening. Conte's red BMW and his friend's Montero jeep were gone.

About a month later, on May 23, 1995, after learning that the Camry had previously been reported stolen and had received three summonses in the vicinity of an address on Bailey Avenue, the police took one of the victims, Diallo, in a surveillance van to the vicinity of that address. Diallo identified defendant when the latter arrived in a vehicle, and defendant was arrested.

Detective Anne Burke testified that she read defendant his *Miranda* warnings from a "rights card" and wrote out a statement that he gave, neither of which she had defendant sign. According to the statement, defendant told an acquaintance that he needed money and the acquaintance introduced him to five men who told him that they had purchased heroin from some African men who resided in an apartment on Lacombe Avenue and had a lot of money. Defendant and the men drove to the complainants' building, blocked Balde's car, handcuffed him and went inside the apartment with him. Defendant looked for money in the apartment but Balde and Diallo told him that they knew nothing about large sums of money. However, Balde told defendant that there were drugs in the car downstairs and gave him the keys. Defendant retrieved the drugs and gave them to two of the men who were waiting downstairs for him in return for $200. He then took a taxi home. When Detective Burke was accompanying defendant to make a videotaped statement, defendant told an assistant district attorney that he was unable to speak English and asked for an attorney, at which point the interview concluded.

Some time later, while canvassing the area with police officers, Balde saw a white Camry, the second car that had blocked his car on the night of the incident. The Camry was parked in front of defendant's house. Using the keys that had been recovered from defendant at the time of his arrest, the police moved the white Camry and upon a warrantless search of the car they found keys to a BMW, handcuffs, latex gloves, the keys to Conte's friend's jeep, and duct tape. Balde and Conte later identified defendant at separate lineups.

At trial, contrary to the unsigned statement, defendant testified that, on April 22, 1995, he went with his friend Gordo to

the Lacombe Street building to exchange some bad drugs Gordo's customers had purchased. Gordo knocked on Balde's door and told Balde he needed to speak to the "boss" about some bad drugs. Balde said the "boss" would be back in a few minutes, and defendant, Gordo and another man, El Primo, sat and watched television while they waited for him. When Conte, another man and some women arrived at the apartment, Gordo and Conte began arguing over the bad drugs. Defendant tried to break up the fight but Diallo, who was bleeding, said he was going to kill Gordo. Defendant told his friends that the men in the apartment had guns and they fled, Gordo in the Montero jeep, El Primo in the BMW, and defendant in his own car. Defendant denied robbing anyone or tying anyone up and denied that he or Gordo or El Primo had a badge or a gun. He also denied making the statement to Detective Burke.

At the conclusion of the trial, defendant was convicted of one count of criminal impersonation in the first degree, one count of burglary in the first degree, one count of kidnapping in the second degree, and three counts of robbery in the first degree, and sentenced to an aggregate indeterminate term of 51½ to 103 years in prison.

Defendant, some four years later, moved to vacate the judgment of conviction pursuant to CPL 440.10 on the ground of ineffective assistance of counsel, based on the following facts. After defendant's arrest on May 23, 1995, his brother-in-law hired an attorney, Julio Cesar Rojas, to represent him. Defendant met Rojas for the first time at his Supreme Court arraignment on June 14th. At that time, the People answered ready for trial and, pursuant to CPL 710.30 (1) (a) and (b), gave defense counsel notice of their intention to enter at trial an inculpatory statement made by defendant and three identifications made of him. Rojas responded by stating that he would waive pre-trial motions if the People truly were ready for trial. At the second call of the case, when the prosecutor who would be trying it appeared and answered that he was ready for trial, Rojas again stated that he would waive motions if the People were really ready. The court proceeded to look for a part in which to try the case. At the third call, the court asked Rojas if he actually was agreeing to waive all motions, except for *Sandoval*, and whether he had discussed this with defendant. After a brief pause in the proceedings, Rojas told the court that he had explained to defendant all the hearings to which he was entitled, namely, *Wade* and *Huntley* hearings and a hearing on the suppression of evidence found in defendant's car, as well as

inspection of the Grand Jury minutes, and had indicated to defendant why he thought it was appropriate to waive them. The court then detailed for defendant the motions that he was waiving and asked whether defendant understood and still wanted to waive them, to which defendant answered yes. Trial of the case began that day.

Defendant's ineffective assistance argument on the article 440 motion was predicated on counsel's failure to seek pre-trial discovery or a bill of particulars, to engage in pre-trial investigation, to meet with him before the start of trial, or to prepare a meaningful case file. Moreover, defendant alleged that counsel told him to answer yes to all the arraignment court's questions about waiving the pre-trial motions, and that he did so because he trusted his counsel and he did not understand the law or the exact meaning of the term, "motions." Defendant argued that, as a result, he was deprived of the opportunity to have the Grand Jury evidence reviewed for legal sufficiency and to have improperly obtained and highly prejudicial evidence suppressed, including suggestive identifications, items seized in warrantless searches, and his alleged statements made in the absence of *Miranda* warnings.

The court denied the article 440 motion, finding, *inter alia*, that defendant had voluntarily waived his rights to any pretrial motions, that he had failed to submit an affidavit from trial counsel, and that he had not met his burden of demonstrating that counsel's decision was not the result of "a reasoned, professional judgment or that such tactic had a reasonable likelihood of success." (Quoting *People v Shaw*, 232 AD2d 174, 175, *lv denied* 89 NY2d 946.) The court noted that defense counsel's strategy was "to call the People's bluff" that they were ready for trial when in fact they might not have been ready. Moreover, the court opined that, since defendant testified at trial that he was involved not in a robbery but in a disagreement between drug dealers, it was reasonable that counsel determined in the pre-trial stage that the People's evidence might not be terribly damaging after all.

It is true that ordinarily a complete record adduced through a motion to vacate the judgment of conviction pursuant to CPL 440.10, which includes an affidavit from trial counsel explaining his or her trial tactics, is necessary in order to properly evaluate a claim of ineffective assistance of counsel (*see, e.g., People v Figueroa*, 254 AD2d 226, *lv denied* 92 NY2d 1049). The failure to present such an affidavit from the attorney or an explanation for the failure to do so has been held to justify

denial of a defendant's motion without a hearing (*see*, *People v Morales*, 58 NY2d 1008). In the instant case, however, defendant provided a viable explanation for the failure to include such affidavit—i.e., counsel's disbarment prior to defendant's bringing the motion, buttressed by the complaint filed with the Grievance Committee regarding Rojas's conduct. It was, therefore, an abuse of discretion for the court to summarily deny defendant's section 440.10 motion on the basis of this procedural deficiency.

In any event, this appears to be the "rare case" where the trial record itself permits review of an ineffective assistance of counsel claim on the direct appeal (*see*, *People v Brown*, 45 NY2d 852). Indeed, that record amply supports defendant's contentions on his section 440.10 motion.

" '[W]hat constitutes effective assistance * * * varies according to the unique circumstances of each representation' * * * [and] '[s]o long as the evidence, the law, and the circumstances of a particular case, viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation, the constitutional requirement will have been met' " (*People v Benevento*, 91 NY2d 708, 712, quoting *People v Rivera*, 71 NY2d 705, 708, and *People v Baldi*, 54 NY2d 137, 147). The core of the inquiry is whether the defendant received "meaningful representation" (*id.*). Further, a reviewing court must avoid confusing ineffectiveness with mere losing tactics and engaging in retrospective analysis (*People v Benevento, supra*). Moreover, the defendant has the burden of demonstrating the absence of strategic or other legitimate explanations for counsel's alleged shortcomings (*id.*; *People v Rivera, supra*).

Generally, a showing that defense counsel failed to make a particular pre-trial motion does not, in itself, establish ineffective assistance of counsel (*People v Rivera, supra*). Where counsel can be shown to have been motivated by strategy or by a reasonable conclusion that there is no colorable basis for a hearing, he or she is not ineffective (*id.*).

The trial record here, however, demonstrates that counsel's decision to proceed to trial on the day of arraignment without any prior investigation or pre-trial discovery and after waiving all suppression motions was not the result of "a reasoned, professional judgment." Counsel explained at arraignment that his reason for being willing to waive pre-trial motions was to test the People's readiness because, as he stated, the People "have been known to use their state of readiness, so-called readiness, in order not to have the time tolled against them. It

has happened to me in the past, Judge, when we're ready to go to trial." Thus, it appears that counsel's decision to waive motions was based not on a belief that such motions had no merit but on a desire "to catch the People in a lie" and make sure that they accrued any speedy trial time attributable to them if they were not, in fact, ready. Indeed, given that counsel had only met defendant for the first time that morning at arraignment and had not done any investigation or received any discovery, it would seem that he had not had the opportunity to formulate a considered judgment about the viability of a motion to suppress or the time to plan a trial strategy. Significantly, counsel himself demonstrated at trial that he believed there was merit to the arguments for suppression by raising the issues of the warrantless seizure of evidence from defendant's car and the police questioning of defendant without having read him his *Miranda* rights, and it may be noted that even the People have not disputed that colorable suppression claims existed. The potential benefit of "calling the People's bluff," to charge them with some speedy trial time, was minimal, compared with the potential benefit of obtaining the suppression of at least some of the evidence damaging to defendant which could have resulted in seriously impairing the People's case as well as the benefit of a reasonable opportunity for discovery, investigation and trial preparation. Thus, defendant had everything to gain and nothing to lose by moving for suppression of the evidence (*People v Donovan*, 184 AD2d 654, 655), and the possible gain of a short period of speedy trial time cannot be considered a strategic or otherwise legitimate explanation for waiving such motions (*People v Rivera*, 71 NY2d 705, 709).

Nor can the alternative explanation advanced by the People and accepted by the motion court regarding counsel's trial performance be considered strategic or otherwise legitimate. The overarching problem with the People's argument is that it seeks to justify counsel's pre-trial actions by what he attempted to do at trial, when it is clear from the record that the defense theory counsel pursued at trial was dictated by his pre-trial failures. If even some of the evidence had been suppressed, the People might have had difficulty in effectively establishing their prima facie case, and counsel might not have had to put defendant on the stand or present any defense at all. Therefore, it was not reasonable for counsel to waive suppression motions at that stage of the proceeding.

The People claim that it was reasonable for defense counsel to forgo suppression of the physical evidence taken from

defendant's car in a warrantless search because the car keys were an integral part of defendant's story that he and his companions stole one of the complainants' cars to avoid being chased. However, of greater significance is that the car keys corroborated the People's theory. The People themselves point out that their "abundant" proof included those keys. Moreover, the remaining items could only incriminate defendant. In any event, it simply makes no sense for counsel to forgo a motion to suppress this evidence in favor of partially discrediting some of the complainants in an effort to convince the jury that defendant was "framed" by the police and the complainants. Counsel may have had no need to pursue this implausible theory if he had successfully moved to suppress the damaging evidence and even a few of the items had been suppressed.

This is also true of the inculpatory statement defendant made allegedly without having first been read his *Miranda* rights. Although this statement is listed as part of the "overwhelming evidence" against defendant, the People claim that it was reasonable for counsel not to seek suppression of the statement because it could be used to discredit Detective Burke in support of the theory that defendant was framed. But Detective Burke's testimony related only to the taking of the statement and the warrantless seizure of the evidence from defendant's car, and if the statement, as well as the evidence, had been suppressed, Detective Burke would not have testified at all. Therefore, it made no sense to forgo a motion to suppress in favor of trying to persuade the jury that the statement was fabricated and that Detective Burke was part of the alleged frame-up.

The People's claim that the failure of defense counsel to challenge the out-of-court identifications of defendant by the three complainants who lived in the Lacombe Avenue apartment was inconsequential is similarly infirm. The alleged suggestive identification procedures detailed by defendant should, at the least, have been tested by a motion to suppress, particularly in view of the inability of the other three witnesses in the apartment to identify defendant as one of the perpetrators.

The People rely, as did the motion court, on defendant's own waiver on the record of all pre-trial proceedings, including motions to suppress. Skepticism is expressed at defendant's assertion that he did not understand what he was waiving, or the significance thereof, but was merely following his attorney's instructions to answer "yes" to the court's questions. While in the absence of any submission by counsel it is not possible to

ascertain whether he did or did not adequately explain to defendant the ramifications of the waiver, that is an essentially irrelevant inquiry here. Whether properly communicated to defendant or not, counsel's decision, and his inducing defendant to accede to that decision, to immediately proceed to trial without any preliminary investigation of the case, without any pre-trial discovery including the failure to pursue colorable suppression issues, cannot under the facts of this case be construed as a decision resulting from "a reasoned, professional judgment" or advancing any legitimate strategic purpose and must be held to constitute ineffective assistance of counsel (*see, People v Rivera, supra,* 71 NY2d at 709; *People v Mackenzie,* 224 AD2d 173 [defendant's claim that he was induced to plead guilty by erroneous advice of counsel sustained as claim of ineffective assistance]; *People v Fields,* 146 AD2d 505 [defendant's claim that he waived his right to challenge his conviction on counsel's improper advice as to the legal effect of the People's nondisclosure of *Rosario* material sustained as claim of ineffective assistance]).

Accordingly, the judgment of the Supreme Court, Bronx County (Richard Price, J.), rendered July 17, 1995, convicting defendant, following a jury trial, of robbery in the first degree, burglary in the first degree, kidnapping in the second degree and criminal impersonation in the first degree and sentencing him to consecutive terms of imprisonment of 12½ to 25 years on the robbery and kidnapping convictions and 1½ to 3 years on the criminal impersonation conviction and to a concurrent term of 12½ to 25 years on the burglary conviction, and order, same court and Justice, entered on or about May 15, 2000, which denied defendant's motion to vacate the judgment pursuant to CPL article 440, should be reversed, on the law and the facts, and the matter remanded for a new trial.

SULLIVAN, P. J., MAZZARELLI, ELLERIN, LERNER and BUCKLEY, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered July 17, 1995, and order, same court, entered on or about May 15, 2000, reversed, on the law and the facts, and the matter remanded for a new trial.