[733 NYS2d 52]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DARIO
BERROA, Appellant.

First Department, November 27, 2001

## APPEARANCES OF COUNSEL

*Karen Swiger* of counsel (*Stanley R. Kaplan* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

*Catharine F. Easterly* of counsel (*Daniel A. Warshawsky* and *Richard M. Greenberg, Office of the Appellate Defender*), for appellant.

## OPINION OF THE COURT

FRIEDMAN, J.

On this appeal, we are required to address the appropriateness of a defense attorney's response to the perjured testimony of defense witnesses. Specifically, we must determine if defendant was deprived of the effective assistance of counsel when his attorney stipulated that a portion of the witnesses' perjurious testimony be removed from the jury's consideration. Examination of authorities from other jurisdictions that have considered situations akin to the one presented here (*see, People v Beals*, 162 Ill 2d 497, 643 NE2d 789; *State v Crespo*, 246 Conn 665, 718 A2d 925, *cert denied* 525 US 1125), as well as the seminal decision of our own Court of Appeals in *People v Baldi* (54 NY2d 137), reveals that the conduct of defense counsel did not deprive defendant of the effective assistance of counsel. We, therefore, affirm the judgment of Supreme Court convicting defendant of murder in the second degree.

Defendant was indicted for the murder of Weber Lewis. At the trial of this action, Lourdes Rodriguez testified for the People that she was walking to the corner of Hunts Point and Garrison Avenues in the Bronx on the afternoon of June 22, 1994 when she saw defendant point a gun at the decedent's head and fire the gun at point-blank range into the decedent's face. Rodriguez was only six feet away from defendant at the time he fired the weapon and described him as having black hair and unique yellow-green eyes.

The People also called James Lopez, who had seen defendant daily for several months dealing drugs in the area. He testified that, on the day of the murder, he was standing near the

decedent when he saw defendant walk up and fire a shot into the decedent's face at point-blank range.

Concerning a motive for the shooting, both Lopez and Wailly Lewis, the decedent's brother, suggested that the murder was the result of a dispute over turf between defendant and the decedent, who had been selling drugs in the area. Lewis, in describing defendant, also testified that he had dark hair and unique "greenish" eyes.

In the face of this overwhelming evidence, defendant sought to establish a defense of misidentification, presenting the testimony of Vivian Rivera, Iris Santiago, and Anna Torres, as well as his own testimony. Their testimony sought to establish that, at the time of the crime, defendant did not have dark hair as described by the witnesses to the murder, but had his hair dyed an orange-yellow color.

As to this defense, Rivera testified that she met defendant in 1992. Thereafter, whenever she saw him he always had his hair dyed a yellow-orange color. Additionally, Rivera claimed that defendant and his girlfriend, Iris Santiago, had been at her home in the Bronx on June 19, 1994, just days before the murder, and that his hair was dyed a yellow-orange color at that time.

Santiago similarly testified that she and defendant had come to New York in June 1994 and that defendant's hair had been dyed a yellow-orange color at that time and prior thereto. However, as her testimony progressed during direct and cross-examination it became apparent that she was constructing an alibi for defendant, claiming that she and defendant came to New York around June 20, 1994, spent an hour or so at Rivera's home, and then left that day for Philadelphia to stay with defendant's sister, Anna Torres. It further became evident that she was claiming that she and defendant did not leave Philadelphia until after June 24, 1994, the date they celebrated the birthday of Torres.

This turn of events generated several conferences out of the presence of the jury in which the court pointed out that defendant had not served an alibi notice as required by CPL 250.20. Defense counsel stated that it was never her intention to present an alibi, but merely to establish that defendant's hair was dyed orange in June 1994. In fact, defense counsel represented that she had spoken with both Santiago and Torres, asking them if they could pinpoint defendant's whereabouts on June 22, 1994, and they stated they could not.

The next day, when the court reconvened, defendant was present almost from the inception of the parties' discussion but

was not initially accompanied by his Spanish interpreter. In view of this, the court advised defense counsel that, while they could begin their discussions on the topic of the alibi, it would make no ruling until defense counsel had an opportunity to consult with her client with the assistance of the interpreter.

Concerning Santiago's testimony, the People agreed that they would not seek to strike her testimony, choosing to deal with the unexpected testimony on cross-examination. The People did, however, seek to preclude Torres's expected testimony insofar as it would establish an alibi for defendant, namely, that defendant stayed with her from June 20 through June 24. After further discussion, however, it became evident that the expected testimony of Torres concerning defendant's hair color would be inextricably interwoven with defendant's alibi. In view of this, the People waived their right to seek preclusion of Torres's testimony.

Recognizing that the People would likely seek to impeach Santiago and Torres on their failure to come forward to law enforcement authorities (or to anyone for that matter) and disclose the exculpatory information they possessed, the court conducted an inquiry pursuant to *People v Dawson* (50 NY2d 311). As part of that inquiry, the court asked defense counsel if she had advised the witnesses to refrain from speaking to law enforcement about their exculpatory information. Defense counsel responded that the witnesses told her that they could not pinpoint defendant's whereabouts on June 22, 1994, and that accordingly she did not instruct them to refrain from speaking to law enforcement authorities about the alibi.

Anticipating the possibility of contrary testimony, the court broached the topic of possible remedies should the witnesses testify that they had told defense counsel of the alibi, stating:

> "Obviously, it is not desirable that you be called as a witness to impeach one of the defense witnesses. Not that you could not be, but I mean if you are now acknowledging that the witnesses had not told you of this alibi prior to yesterday, then what I would ask is would you be willing if it becomes necessary to agree to a stipulation that the witness did not tell you of this alibi."

Defense counsel agreed to this as a possible remedy, subject to any objections she might have concerning the particular wording of the stipulation.

On cross-examination, Santiago was asked whether she ever told anyone that defendant was with her on June 22, 1994.

Santiago responded that she specifically told defense counsel that defendant was with her on that day.

Since Santiago had testified that defendant's hair had been dyed orange at the time of the murder and suggested that she specifically recalled his hair being orange in January 1994, and for several years prior thereto, the prosecutor then proceeded to impeach this aspect of her testimony. To do so, the prosecutor first advised the court that defendant had been arrested for an unrelated robbery in the Hunts Point Avenue area (one block away from the scene of the murder) in January 1994, just five months before the murder. The arrest photo plainly showed defendant with dark hair, not the orange hair that Santiago and Rivera claimed he had. After redacting those parts of the photograph that would reveal that it was an arrest photograph, Santiago was confronted with the photograph and forced to backtrack on her testimony, stating that she could not remember defendant's appearance in January.

Torres was the next defense witness to testify. Like Santiago, Torres testified that defendant was at her home from June 20, 1994 through June 25, 1994 and that his hair was a yellow color. When questioned on cross-examination as to whether she told anyone about her exculpatory information prior to trial, Torres testified that she told defense counsel that defendant was at her home on June 22, 1994.

Defendant was the final witness to take the stand, testifying that his hair was dyed in June 1994. At the conclusion of this testimony, the defense rested.

The next day, the proceedings commenced with a discussion of the previously mentioned stipulation concerning the witnesses' testimony. After the discussion, the court, the prosecutor, and defense counsel agreed that the following stipulation would be read to the jury:

> "It is stipulated and agreed by [defense counsel] that prior to their appearing in New York to testify in this case, Miss Santiago and Miss Torres had spoken with her and that neither Miss Santiago or [sic] Miss Torres specifically told [defense counsel] the defendant, Dario Berroa, had been in Philadelphia specifically on June 22nd, 1994."

Subsequently, defense counsel delivered her summation, beginning with some introductory remarks. Then defense counsel pointed out that from "day one" she told the jury that the pivot point of the case was misidentification. As to the alibi

evidence, she stated that the court would instruct the jury concerning alibi testimony and that "you can take it for what you want, you can disregard it, you can look at it. You heard my stipulation." From that point on, defense counsel focused her argument on the defense of misidentification and, contrary to the contention of the dissent, defense counsel made no further references to the stipulation.

As for the prosecutor, she made no reference in her summation to the stipulation, other than to comment upon Santiago's failure to tell anyone about the exculpatory information she possessed for the 2½ years of defendant's incarceration. Actually, her summation focused on the multitude of inconsistencies in the testimony of defendant and his witnesses, and juxtaposed those inconsistencies with the certainty of the eyewitnesses' identification.

At the conclusion of deliberations, the jury convicted defendant of murder in the second degree. This appeal followed.

In seeking a reversal of his conviction, defendant argues that he was denied the effective assistance of counsel because his attorney stipulated that Santiago and Torres had not told her about the alibi. Counsel's decision to stipulate, it is alleged, was improperly motivated by her desire to protect her reputation for integrity, thereby creating a conflict, and depriving him of the effective assistance of counsel. These contentions lack merit.

In order to establish an ineffective assistance of counsel claim, "the defendant has the burden of demonstrating the absence of strategic or other legitimate explanations for counsel's alleged shortcomings" (*People v Gil*, 285 AD2d 7, 12; *see also, People v Benevento*, 91 NY2d 708, 712; *People v Rivera*, 71 NY2d 705, 709). In the absence of such a demonstration, it will be presumed that defense counsel acted in a competent manner (*People Rivera, supra*). Considered in other terms, "[c]ounsel's performance should be 'objectively evaluated' * * * to determine whether it was consistent with strategic decisions of a 'reasonably competent attorney'" (*People v Benevento, supra*, at 712 [citations omitted]). Assessed against these standards, defendant was not denied the effective assistance of counsel.

Initially, we do not agree with the conclusion reached by the dissent that defense counsel's motivation in agreeing to the subject stipulation was to protect her reputation. It is well settled that an attorney's duty to advance the interests of her client is circumscribed by an " 'equally solemn duty * * * to

prevent and disclose frauds upon the court'" (*People v DePallo*, 96 NY2d 437, 441, quoting *Nix v Whiteside*, 475 US 157, 168-169). As conceded by the dissent, this solemn duty mandated that defense counsel in this case reveal the potential for witness perjury to the court (*see, People v DePallo, supra; Matter of Friedman*, 196 AD2d 280, *appeal dismissed* 83 NY2d 888, *cert denied* 513 US 820; Code of Professional Responsibility DR 1-102 [a] [4], [5]; DR 7-102 [a] [3], [6] [22 NYCRR 1200.3 (a) (4), (5); 1200.33 (a) (3), (6)]). Defense counsel's revelation, therefore, was not the result of a desire to protect her reputation, but was the result of her obligation to comply with the ethical standards governing her conduct.

This being so, it is logically incoherent to believe, as the dissent asserts, that defense counsel was properly guided by her ethical obligations when she revealed the potential for perjury to the court, but that she labored under improper motivations when she subsequently agreed to enter into the stipulation. Viewed otherwise, if in fact defense counsel sought to protect her reputation, she successfully accomplished that goal when she revealed the potential for perjury to the court and nothing that occurred thereafter could have conceivably been motivated by any reputational concerns.

Apparently recognizing the deficiency in his position, defendant argues that defense counsel, by entering into the stipulation, effectively became an adverse witness against him, thereby depriving him of the effective assistance of counsel. The dissent agrees with this proposition, asserting that defense counsel violated the advocate-witness rule (*see,* DR 5-102 [b] [22 NYCRR 1200.21 (b)]), which precludes an attorney from representing a client if she will be called to testify as a witness against her client. This violation of the advocate-witness rule, it is alleged, injected defense counsel's credibility into the case and destroyed the credibility of defendant's primary witnesses. Contrary to the position of defendant and the dissent, there was no violation of the advocate-witness rule under the circumstances presented and certainly no basis for a finding of ineffective assistance of counsel.

In reaching this conclusion, we begin our analysis with the decision of the Supreme Court of Illinois in *People v Beals* (162 Ill 2d 497, 643 NE2d 789). In *Beals*, the defendant was convicted of murder and aggravated battery in connection with a drive-by shooting. Shortly before the shooting, the six-year-old deceased victim and his mother (who was also shot) were walking on the street when they encountered the defendant

and another man, Steven Johnson, arguing on the sidewalk. The argument apparently related to a territorial dispute over who could sell drugs in the neighborhood.

The defendant returned briefly to his apartment and then drove past the location, firing his weapon from the car. The gunman (defendant) was described by the decedent's mother and an eyewitness as being between five feet, nine inches and six feet tall, and wearing a red and white jacket both at the time of the argument and at the time of the shooting.

The defendant's theory at trial was that the victims were shot by an unidentified gunman. In support of this theory, defendant offered the testimony of two friends, Sidney Cobb and Norman Yancy. Cobb testified that he was in the defendant's apartment shortly before the shooting. The defendant, according to Cobb, left the apartment to speak to Johnson and then returned for his red and white Adidas jacket. When defendant left again, he was not armed. Cobb testified that he then left the apartment and saw a man wearing a blue jogging suit fire shots towards defendant, who was in his car, and then run into an alley.

Yancy testified that he saw two men arguing from his house across the street. Shortly thereafter, he saw a light-skinned man wearing a blue and black outfit shooting a gun. The shooter, it was alleged, then escaped in a car that drove into the alley to pick him up. On cross-examination, Yancy denied that he previously described the shooter as a 20-to-30-year-old man, six feet, five inches tall and light-skinned. Both Cobb and Yancy testified that they had previously told the defendant's attorney what they had seen.

On the People's rebuttal case, "[t]he parties first stipulated that Yancy told defense counsel during a meeting in defense counsel's office in April 1989, at which defendant's sister was present, that the driver of the car that picked up the shooter was light-skinned, thin, 20 to 30 years old and approximately 6 feet 5 inches tall. The State and defense counsel also stipulated that Cobb told defense counsel that the defendant wore his red and white Adidas jacket during his argument with Johnson. In surrebuttal, defendant testified that he did not wear the jacket during his argument with Johnson" (*id.* at 503, at 792-793).

Reversing the defendant's conviction, the intermediate appellate court enunciated the identical argument made by defendant and the dissent in this case, stating:

"The stipulation entered into in the instant case * * * cannot be considered trial strategy since it destroyed the credibility of the defense. Trial counsel personally testified by way of stipulation against his own client. Counsel testified to critical information impeaching two key defense witnesses, Norman Yancy and Sidney Cobb, thereby destroying the credibility of the only witnesses to corroborate defendant's version of events" (248 Ill App 3d 19, 24-25, 618 NE2d 273, 277).

The Illinois Supreme Court reversed the intermediate appellate court and reinstated the conviction, concluding that:

"defense counsel's decision to stipulate to Cobb's and Yancy's prior inconsistent statements was clearly a strategic move aimed at minimizing the prejudicial effect of those statements. Had counsel not entered into the disputed stipulations, the State could have introduced Cobb's and Yancy's prior statements in another manner * * * In sum, the defendant has failed to overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' [citation omitted]" (162 Ill 2d 497, 505-506, 643 NE2d 789, 794).

Similarly, the Supreme Court of Connecticut in *State v Crespo* (246 Conn 665, 691, 718 A2d 925, 939, *cert denied* 525 US 1125) stated that "[t]he use of a stipulation rather than an attorney's testimony has been accepted as a legitimate trial strategy when the information in the stipulation otherwise could have been presented by the prosecution, but the use of the stipulation was strategically preferable."

Consistent with *Beals* and *Crespo*, our own Court of Appeals, in *People v Baldi* (54 NY2d 137), has also indicated that a defense counsel's testimony, even if facially adverse to his client, does not necessarily give rise to a claim of ineffective assistance of counsel or a violation of the advocate-witness rule. In *Baldi*, the defendant was convicted in separate trials of the attempted murder of a police officer and an unrelated stabbing murder. At his trial concerning the police officer, the defendant took the stand and denied the events testified to by the arresting officer. His attorney, however, took the witness stand and testified to two police interviews at which he was present. Seeking to establish an insanity defense, defense counsel contradicted his client and then recounted, *inter alia*, how defendant had previously confessed, in a trance-like state, to the murder

of four women and the assault of 10 other women. On appeal, the defendant asserted that he was denied the effective assistance of counsel when his attorney failed to pursue his claim of innocence and testified against him at his own trial.

Finding that the defendant's claim lacked merit, the Court of Appeals stated:

> "[Defense counsel] taking the stand was consistent with and strengthened the insanity defense * * * *True, [defense counsel] contradicted his client, but did so for a proper purpose*—the establishment of the insanity defense. Nor was there impropriety in [defense counsel's] remarks in summation, during which he understandably declined to vouch for his client's credibility, but argued the weaknesses in the State's case and emphasized defendant's insanity" (*id*. at 148-149 [emphasis added]).

The Court also pointed out that, although defense counsel testified at his client's trial, this did not, under the circumstances presented, constitute a violation of the advocate-witness rule (*id*. at 149 n 1; *see also*, DR 5-101, 5-102 [22 NYCRR 1200.20, 1200.21]).

What emerges from *Beals*, *Crespo*, and *Baldi* is that a defense attorney's stipulation (or even testimony) to facts facially adverse to his client does not ipso facto constitute ineffective assistance of counsel or a violation of the advocate-witness rule. Rather, the determinative consideration is whether counsel's decision to stipulate to certain facts could be viewed as part of a legitimate defense strategy—a strategy that a "reasonably competent attorney" might have pursued under similar circumstances (*see, People v Satterfield*, 66 NY2d 796, 799). Judged against this standard, defense counsel's decision to enter into the stipulation in this case cannot be viewed as a basis for reversal.

Here, the central flaw alleged by the dissent was defense counsel's failure to withdraw from her representation of defendant.[1] Contrary to the dissent's contention, however, this was hardly a desirable outcome from defendant's perspective. If defense counsel withdrew, and another attorney was

---

1. Although the dissent asserts that the possibility of withdrawal was not considered by the court or counsel, this is belied by the record. The court specifically broached the topic when it indicated that the stipulation could avoid the undesirable possibility of counsel becoming a witness for the People. Thus, it is apparent that everyone recognized the difficulty that the witnesses' perjury was creating from an ethical and procedural standpoint.

substituted in her place, there was a distinct possibility that she would be called by the People to rebut the testimony of Santiago and Torres either in the trial at hand, or, in the more likely event of a mistrial, at the retrial of the criminal action (*see, People v Knight*, 80 NY2d 845; *see also, People v Tillman*, 179 AD2d 886).

If this scenario had in fact occurred, defense counsel's testimony would have been far more damaging than her limited stipulation, which only indicated that the witnesses had not told her about the alibi before trial. As noted, during colloquy with the court, defense counsel represented that she interviewed Santiago and Torres and asked them whether they could pinpoint defendant's whereabouts on the date of the murder. They specifically told her that they could not. If called as a witness, this testimony, which would surely have been elicited by the People, would have undermined far more of the witnesses' testimony than the limited portion addressed by the stipulation.

What therefore evolves is that defense counsel's decision to stipulate appears to have been a legitimate tactic designed to minimize the potential damage to defendant's case, and may very well have been the preferred method to deal with the witnesses' perjury under the circumstances. It follows that defendant has failed to meet his burden of demonstrating the absence of strategic or other legitimate explanations for counsel's conduct.

Turning to defendant's claim that Supreme Court was required to obtain his consent before the stipulation was read into evidence, this claim is likewise without merit. "[A] defendant who has a lawyer relegates control of much of the case to the lawyer except as to certain fundamental decisions reserved to the client," such as deciding whether to plead guilty, whether to waive a jury trial, whether to testify at trial, and whether to take an appeal (*People v Ferguson*, 67 NY2d 383, 390). Here, the determination as to how to deal best with the witnesses' perjury did not fall into the limited class of fundamental decisions requiring defendant's consent (*see, People v Ferguson, supra; People v Barnes*, 249 AD2d 227, *lv denied* 92 NY2d 893; *People v McCaskell*, 217 AD2d 527, *lv denied* 87 NY2d 848; *see also, People v Rodriguez*, 95 NY2d 497, 502 [a defense counsel, "by reason of training and experience, is entrusted with sifting out weak arguments, charting strategy and making day-to-day

decisions over the course of the proceedings"]).[2]

In any event, even if the court should have sought defendant's consent to the use of the stipulation (because of an alleged conflict of interest between himself and his counsel), reversal of his conviction would still not be required. "[D]efendant overlooks the well-established principle that the mere existence of a conflict or potential conflict * * * does not automatically result in the reversal of a conviction * * * Rather, in order to establish that reversible error occurred, defendant must show that ' "the conduct of his defense was in fact affected by the operation of the conflict of interest" ' " (*People v Allen*, 88 NY2d 831, 832 [citations omitted]). Defendant cannot show such an effect because he never had a right to have the jury consider the perjured testimony in the first instance (*see, Nix v Whiteside*, 475 US 157).

Finally, defendant has failed to demonstrate that he suffered any prejudice, as that term is defined under either the Federal or State Constitution (*see generally, People v Benevento*, 91 NY2d 708, 713-714 [discussing the differing standards]), for purposes of sustaining an ineffective counsel claim. The evidence against defendant was overwhelming. Not only did two witnesses see defendant commit the crime in broad daylight, but one of them, Lopez, knew defendant well, having seen him daily for several months. Additionally, the description given by these witnesses accurately matched defendant, who had unique yellow-green eyes.

While the defense witnesses sought to establish that defendant had orange hair at the time of the murder and for several years prior thereto, the credibility of that testimony was destroyed by the photograph of defendant taken just months before the crime, which plainly showed that he had dark hair.

---

2. We also note that, contrary to the dissent's contention, defendant's very brief absence from the courtroom during some of the colloquy between counsel and the court regarding the perjurious testimony does not support reversal of his conviction (*see, People v Keen*, 94 NY2d 533, 539; *see also, People v DePallo, supra* [defendant's presence for discussion concerning anticipated perjury not required]). In any event, at the time of defendant's absence, the court specifically stated that it would make no ruling on the issues before it until defense counsel had an opportunity to speak with defendant in the presence of the interpreter. We can therefore presume that defense counsel did consult her client. To the extent that defendant contends to the contrary, such a contention is dehors the record and can only be established by developing the record in post-conviction proceedings, not on direct appeal (*People v Gil*, 285 AD2d 7).

As to defense counsel's failure to pursue or argue an alibi defense, this did not result, as the dissent contends, from a conflict of interest, incompetence of counsel, or from an imprudent decision to enter into the subject stipulation. From the inception of trial, defense counsel stated that she was presenting a defense of mistaken identification, not an alibi. It is apparent that this decision was the result of her pretrial interviews with defendant and the witnesses, none of whom could state where defendant was on the date of the murder. While the witnesses testified to the contrary at trial, defense counsel may very well have felt bound by her ethical obligation to avoid using perjured testimony, which belief, on this record, was well-founded.

In sum, it was defendant's burden to establish the absence of a strategic or legitimate explanation for defense counsel's decision to enter into the subject stipulation. Since there is at least one very legitimate explanation supporting counsel's decision, defendant has failed to meet his burden.

We have examined defendant's remaining contentions and find them to be without merit.

Accordingly, the judgment of the Supreme Court, Bronx County (Peter Benitez, J.), rendered August 1, 1997, convicting defendant, after a jury trial, of murder in the second degree, should be affirmed.

TOM, J. (dissenting). The issue on this appeal is whether defendant was deprived of his right to effective, conflict-free counsel and, if so deprived, whether our reversal of his judgment of conviction is mandated. I conclude that the unusual facts of this case require a reversal and a new trial.

Defendant was indicted for murder in the second degree and other offenses arising out of the June 22, 1994 point-blank shooting death of a drug dealer at Hunts Point and Garrison Avenues in the Bronx. He was arrested the following year after police were alerted to his whereabouts. Defendant denied having known the deceased, and denied having been at the location on the day of the shooting. Defendant's claim of misidentification was predicated on his alleged hair color at the time of the descriptive testimony of the People's witnesses. Defendant asserted that in June 1994 he was distinguished by having reddish-yellowish hair, in contrast to testimony that the killer was dark-haired. Arrest photos, taken a year later, depict defendant with reddish hair, which the People argued was a disguise adopted after the killing. By the time of trial his natu-

ral darker-colored hair had again grown out. Defendant was identified in a lineup by eyewitnesses to the shooting.

Defendant's counsel, appointed a few weeks before trial, indicated to the court that she would interpose a misidentification, but not an alibi, defense. In fact, in her opening statement to the jury, counsel argued that the issue before them was "whether or not the person * * * arrested approximately one year later was the person who did [the shooting] in broad daylight." The prosecutor noted that no alibi notice had been provided but expressed a concern that the defendant or his witnesses might argue that he was not at the location of the crime and in fact was somewhere else at the time. Defense counsel informed the court that while the prospective defense witnesses had told her that defendant had traveled from Boston to New York to Philadelphia in June of 1994, they could not pinpoint his whereabouts at the time of the shooting. Counsel further informed the court that she was calling these witnesses only to adduce evidence regarding the distinctive nature of defendant's appearance at the time of the shooting.

Prior to the defense case, the issue of alibi testimony arose again. The court reminded counsel that they had discussed the issue previously, and reminded counsel that she had represented that the witnesses were being called only to establish defendant's appearance at the time of the shooting and that "none of those witnesses were going to testify to their knowledge of the defendant's whereabouts on the date of the crime. Nor were they going to testify to circumstances which would make it impossible for the defendant to have been in New York or at the location where the crime was committed on the date of the crime."

Defendant, his friend Vivian Rivera, the mother of his child Iris Santiago, and his sister Anna Torres, testified on behalf of the defense.

Much of Vivian Rivera's direct examination concerned defendant's appearance in June of 1994. On cross, she stated that she had met Iris Santiago with defendant around Father's Day, "after Father's Day probably * * * I know they went to Philadelphia for a party for his sister. They came back from Philadelphia." The court took judicial notice that Father's Day was on June 19th in 1994. Iris Santiago, a resident of Massachusetts, testified that she and defendant were living in Massachusetts during 1994. She testified about defendant's orange hair, which her sister had dyed in 1992, and which also characterized his appearance in June 1994. She then recalled

being with defendant in New York and Philadelphia during June 1994. Though she could not recall the exact date when they were in Philadelphia, she estimated that it might have been around the 20th. They were there for a birthday party for defendant's sister, Anna Torres.

At this point, just prior to cross-examination, the court called a sidebar. The court stated "We got a problem. You are suggesting an alibi for your client through the 22nd by having the witness testify that * * * at or around the 20th that they went to Philadelphia, suggesting that, leaving it open that they were in Philadelphia on the 22nd." The prosecutor informed the court that Anna Torres's birthday was on June 24. The court expressed a concern that an alibi defense was being suggested, and indicated that the next witness might not be allowed to so testify. Defense counsel indicated that this sequence was unclear, in that Santiago also indicated that they had left Massachusetts on June 20th, and that they seemed to go to New York after that, which seemed to omit their presence in Philadelphia on the 20th. Counsel stated "I'm only going by what they tell me * * * I don't want to make any misrepresentations." Counsel indicated that Torres would testify only that defendant was with her at her party in Philadelphia on June 24th and that defendant and Santiago did not arrive at Torres's home until that date.

During cross, the prosecutor asked Santiago whether it was correct that they went to Torres's in Philadelphia on June 24th to celebrate Torres's birthday, but Santiago responded "We went around the 20th, around there." The prosecutor then asked "you left to go to her home from New York, is that correct?" She answered that they left from Massachusetts in the morning, stopped for a short time in New York, and then continued on to Philadelphia. The court excused the jury to inquire of the witness whether her testimony would include defendant's presence in Philadelphia on June 22nd. During the colloquy, the witness confirmed that defendant was with her in Philadelphia on June 22, the date of the shooting. The court then indicated to defense counsel that it was clear, as the prosecutor had foretold, that an alibi defense was being constructed in front of the jury without the prosecution having had an opportunity to conduct an investigation. The court reminded counsel that she had represented that the witnesses would testify only about defendant's appearance, and not about his whereabouts outside of New York on the day of the shooting. Defense counsel professed to be "as shocked as [the

prosecutor] and if anything in my job I pride myself on [it is] my credibility and if I had heard what has been testified to today I would certainly have told both the assistant and the court." Although the majority asserts that counsel's action was not intended to protect her own reputation, this and other similar statements by counsel underscore just such a motivation. Counsel further stated that she had limited her direct examination of Santiago to defendant's appearance and had made no attempt to advance the unnoticed alibi testimony.

On the next day, in the absence of defendant, the court and attorneys conducted another conference at which time the prosecutor announced that she would not seek to strike Santiago's alibi testimony but instead would only question her as to when she came into possession of this information and when she first disclosed it to someone. At this point, defendant was brought into the courtroom but his Spanish interpreter was still not present. The prosecutor also stated that she would not seek to strike any alibi testimony from Torres or defendant. The court then asked defense counsel if she had any reason to believe that the defense witnesses, by withholding their alibi information, had been acting on the advice of counsel. Counsel stated that the witnesses had never given her or any other lawyer any alibi information and that, in fact, defendant had never even had any contact with his former counsel. The court then ruled that the prosecutor would be permitted to cross-examine the defense witnesses about their alibi testimony.

The court, anticipating another potential problem, asked defense counsel if it was possible that the defense witnesses would testify that they had told her about the alibi. Counsel stated that such testimony would not be true and that she would be willing to sign a stipulation to that effect. The record reflects the presence of defendant's interpreter only after counsel had volunteered to enter into a stipulation and after the jury was brought back into the courtroom.

During cross-examination, Santiago recalled with crystal clarity that on June 22, 1994 she had been with defendant in Philadelphia. Defendant's sister, Anna Torres, confirmed Santiago's testimony that defendant arrived at her Philadelphia home on June 20th and stayed until he left on June 25th. Defendant, testifying in his own defense, indicated that he had left Massachusetts by bus on June 20, and left Philadelphia, also by bus on June 25th, but that he did not have an exact memory of where he was on June 22nd.

The prosecutor asked both Santiago and Torres if they had told defense counsel about defendant's alibi prior to trial. They

replied that they did. After the defense rested, the court and counsel drafted defense counsel's stipulation. Defendant was not present during these discussions. As part of the People's rebuttal case, the court read to the jury the stipulation drafted by defense counsel. In it, defense counsel stated that: "[P]rior to their appearing in New York to give testimony in this case, Miss Santiago and Miss Torres had spoken with her and that neither Miss Santiago or Miss Torres specifically told [counsel] that the defendant * * * had been in Philadelphia specifically on June 22nd, 1994." When held up against the witnesses' testimony, this stipulation effectively conveys that the witnesses lied.

Although the majority surmises that there might have been a strategic reason, benefitting defendant, for the stipulation, the record is barren of support of such speculation.

At the charge conference, the prosecutor stated that she was going to argue that the alibi testimony had been fabricated. Defense counsel informed the court that she did not want the court to charge the jury that a witness with exculpatory information has no duty to report this information to law enforcement, in light of "what happened." Instead, she stated that she would deal with the issue in the summation.

During her closing argument, defense counsel reminded the jurors that she had told them "from day one" that the only issue at trial was misidentification and that she never stated that there would be an alibi defense. She then told the jurors that the court would instruct them on the law regarding alibis and that they could "take it for what you want, you can disregard it, you can look at it." However, she then concluded her summation by reminding the jurors that they had heard her stipulation.

The court provided an alibi charge, and the jury, obviously, rejected the alibi defense and convicted defendant of murder in the second degree. Defendant was sentenced to a term of 25 years to life.

On appeal, defendant contends that he was deprived of his constitutional right to conflict—free counsel when his attorney volunteered to stipulate that defendant's main witnesses were perjuring themselves at trial, thereby eliminating any chance of an acquittal.

A lawyer's obligation to his or her client is a cornerstone of American law. A breach of this obligation can erode and eviscerate the constitutional right to a fair trial which forms

the underpinning of our jurisprudence. As the Court of Appeals has recently remarked, "[t]he New York State and Federal Constitutions guarantee the right to effective assistance of counsel, meaning representation that is reasonably competent, conflict-free and singlemindedly devoted to the client's best interests" (*People v Longtin*, 92 NY2d 640, 644, *cert denied* 526 US 1114).

Of course, "[a] defendant claiming ineffective assistance of counsel must do more than show that defense counsel had a potential conflict of interest. To prevail, defendant must demonstrate that 'the conduct of his defense was in fact affected by the operation of the conflict of interest,' or that the conflict 'operated on' counsel's representation" (*People v Longtin, supra* at 644, quoting *People v Alicea*, 61 NY2d 23, 31; *see also, People v Ortiz*, 76 NY2d 652). Once defendant establishes that counsel "actively represented conflicting interests" and "that an actual conflict of interest adversely affected his lawyer's performance," prejudice to the defendant is presumed (*see, Cuyler v Sullivan*, 446 US 335, 350; *and see, Government of Virgin Is. v Zepp*, 748 F2d 125).

In the instant case, defendant's counsel placed her own interest in preserving her professional credibility above that of her client. Counsel's volunteered stipulation, read before the jury, attacking the credibility of defendant's witnesses had, in fact, created a conflict of interests which clearly undermined her client's defense. It is likely that the stipulation also adversely affected the jury's consideration of misidentification testimony given by the same witnesses specifically regarding defendant's appearance at the time of the shooting. Since counsel's stipulation informed the jury that the defense witnesses had lied, she was then unable to rely on their testimony in her closing argument and, as she informed the court, was unable to request a charge with respect to the duty of witnesses with exculpatory information. She further demonstrated her conflict of interests at the conclusion of her summation by reminding the jurors that they had heard her stipulation and that the jury was free to disregard alibi testimony.

The Code of Professional Responsibility provides that "[t]he roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively" (EC 5-9). Also, an attorney may not continue to represent a client when it is apparent that the attorney may be called as a witness "other than on behalf of the client [and where] it is apparent

that the testimony would or might be prejudicial to the client" (DR 5-102 [b] [22 NYCRR 1200.21 (b)]). Hence, when presented with perjured testimony, the attorney first must determine what to do with the information, consistent with his or her responsibilities to the court as well as to the client, but then must also evaluate whether his or her representational role may continue.

In the first instance, informing the court of the potential for perjury would not, itself, conflict counsel (*Matter of Friedman*, 196 AD2d 280, *appeal dismissed* 83 NY2d 888, *cert denied* 513 US 820; DR 1-102 [a] [4], [5]; DR 7-102 [a] [3], [6] [22 NYCRR 1200.3 (a) (4), (5); 1200.33 (a) (3), (6)]). Indeed, we have previously remarked that a defense attorney's ethical duty to advance the interest of the client is circumscribed by an " 'equally solemn duty' to 'prevent and disclose frauds upon the court' " (*People v Campos*, 249 AD2d 237, 238, *lv denied* 92 NY2d 923, quoting *Nix v Whiteside*, 475 US 157, 168-169). As the Fourth Department has stated, "[t]here is no constitutional right to commit perjury * * * nor is there a constitutional right to the assistance of counsel to commit perjury" (*People v Tyler*, 245 AD2d 1100, *lv denied* 91 NY2d 978). However, the disclosure of the fraud to the court does not lead inevitably to disclosure of misstatements to the jury. In *Campos*, counsel had properly informed the court of the client's confidential request to have counsel participate in an apparent scheme to lay a false foundation for a speedy trial application. Under those circumstances, counsel's disclosure to the court did not create conflict between counsel's own reputational and ethical interests and the client's interest in a zealous defense. Moreover, even if a conflict could have been gleaned from that disclosure, there was no showing that it affected counsel's conduct of the defense. A different result obviously obtains when defense counsel informs the jury that the defense of alibi is a recent fabrication.

In this case, the first part of the analysis was academic—the court knew of the potential perjury. The problematic determination was whether or not counsel could continue as trial counsel. Oddly, that issue was never really raised, let alone entertained, except for a brief off-hand comment by the court. Rather, counsel suggested and the court agreed with a device—the stipulation—that assuredly would reflect unfavorably upon the defense in the eyes and evaluation of the jury. Not only did the stipulation undermine the defense, broadly speaking, but it pitted counsel's own credibility against that of defendant's primary and only witnesses, a clear conflict.

The majority contends that counsel, by stipulating, in effect, that defendant's critical witnesses lied, protected the defense by avoiding the possibly greater damage that would result were she called as a witness. I respectfully suggest, though, that the scope of her testimony and even whether she would have been called remain uncertain, and the conclusion that it would have been more damaging remains speculative. The point is that the court could have taken steps to remove the conflict in total, rather than allowing a lesser conflict to taint the trial.

Notably, defendant was never part of the discussions among the attorneys and the court regarding how to handle the surreptitious alibi defense. Hence, "[a] defendant is denied the right to effective assistance of counsel guaranteed by the Sixth Amendment when, absent inquiry by the court and the informed consent of defendant, defense counsel represents interests which are actually in conflict with those of defendant * * *. Initially it is defense counsel's burden to recognize the existence of a potential conflict of interest, to alert both the client and the court to the potential risks involved, and to obtain the client's informed consent to counsel's continued representation despite those risks" (*People v McDonald*, 68 NY2d 1, 8). An inquiry by the court may be advisable and even necessary to establish informed consent, insofar as the court must be satisfied that defendant has " 'an awareness of the potential risks involved in that course and [that he had] knowingly chosen it' * * *. This inquiry is vital 'because defendants may not always sense when a conflict exists or perceive how it might undermine effective representation' " (*People v Wandell*, 75 NY2d 951, 952-953, quoting *People v Gomberg*, 38 NY2d 307, 313-314, and *People v Mattison*, 67 NY2d 462, 468, *cert denied* 479 US 984). Here, the record does not substantiate the fact that defense counsel entered into the stipulation with the full knowledge and consent of defendant. Defendant was either absent for part of the proceedings or was without the assistance of his interpreter. No one explained to defendant that the attorney's stipulation would abrogate his right to conflict-free counsel, the majority's speculation to the contrary notwithstanding. The record is devoid of the nuanced inquiry thus required to ensure that the representation be conflict-free and, if potentially not, that defendant affirmatively, volitionally and knowledgeably agreed to the continued representation by conflicted counsel. The absence of an appropriate inquiry under these circumstances requires a reversal (*People v*

*Macerola*, 47 NY2d 257; *People v Carillo*, 218 AD2d 505). The case law relied on by the majority, articulating the general proposition that a defendant's consent on various strategic matters is subsumed in counsel's representation, has no application under the circumstances of this case and does not govern this specific problem and the specific rules that have arisen to address it.

In this case, it must be conceded that defendant's witnesses created the alibi problem, and that, once presented with this apparent subterfuge, the prosecutor helped chart the trial's subsequent course in dealing with the alibi issue. As such, defense counsel cannot be faulted for the prosecutor's acquiescence in the evolving alibi defense, or the prosecutor's choice to address it by cross-examination of the alibi witnesses. However, as noted above, this is not why we must reverse. There were various procedural options to address the surreptitious alibi, as such, at the court's disposal, including preclusion of the alibi testimony, declaring a mistrial and other means of sanitizing the trial record. Allowing a beleaguered defense counsel, and a duped prosecutor, to effectively provide counsel's personal statement that her client's only witnesses were fabricators, cannot under the circumstances of this case be seen as a valid means of resolving the conflict. While the conflict apparently arose from the conduct of defendant's own witnesses, it still could not have been resolved in a manner that pitted counsel's credibility against that of defendant's own defense. As we stated some three decades ago, "[t]he calling or volunteering of defense counsel as a witness who, in effect, branded his client a liar, could only result in the jury's disparagement, if not total rejection, of his client's testimony" (*People v Guillont*, 40 AD2d 658). Simply put, an attorney, representing a client at trial, cannot function as an advocate when forced to contradict, to the jury, crucial elements of a defense (*see, Uptain v United States*, 692 F2d 8). We have recognized that when the trial counsel essentially distances himself or herself from the defendant, before the jury, then the conflict may "actually operate[ ] on the conduct of the defense" (*People v Jackson*, 218 AD2d 556, 558, *lv denied* 87 NY2d 847). Where a defendant establishes that counsel "actively represented conflicting interests," and "that an actual conflict of interest adversely affected his lawyer's performance," then courts presume prejudice to the defendant (*Cuyler v Sullivan*, 446 US 335, 350; *see also, Government of Virgin Is. v Zepp*, 748 F2d 125). The conflict in this case, as noted, and as even articulated in counsel's own trial colloquy, was between

defendant's alibi and counsel's reputational concerns. It is hard to see how the contest of credibilities played out before the jury was other than fatally detrimental to the defense, a conclusion underscored by counsel's own suggestion to the jury that they ignore the alibi testimony of defendant's own intimates. Although the evidence against defendant was strong, any doubt the jurors possibly entertained about his guilt was effectively put to rest by defense counsel's agreement. Counsel's stipulation sealed defendant's fate.

The majority relies on an Illinois case and a Connecticut case to reach a different conclusion—basically that the stipulation actually served a legitimate strategy and as such did not vitiate the effectiveness of counsel's representation. Of course, these rulings are not controlling authority, and the absence of New York authority in support is telling. Nor, on closer examination, are those cases helpful. In *People v Beals* (162 Ill 2d 497, 643 NE2d 789), the defendant called two friends to the stand to support his theory that the killing was actually perpetrated by an unidentified third party and that the defendant was merely in the vicinity. In some descriptive details, their testimony diverged, and on cross-examination, one of the witnesses denied that he had previously provided a description of the shooter as a 20 to 30 year old male, six feet, five inches and light-skinned. In rebuttal, stipulations from defense counsel were introduced that indicated that the witness, in fact, had previously provided such a description and that the other witness also provided a different description of certain items of the defendant's clothing on the night of the shooting. The intermediate appellate court found that the stipulations, by establishing the prior inconsistent statements of the witnesses, destroyed the credibility of the only eye witnesses. But the Illinois Supreme Court, in reversing and reinstating the conviction, found, rather, that the stipulations supported those witnesses as to the essential details of the defense and that any discrepancy in descriptive details was not unduly significant. Further, the court held the State could have introduced the inconsistent statements of the witnesses in another manner. Parenthetically, the court found that the stipulations also minimized the prejudicial effect of the inconsistencies. As such, the stipulations were actually consistent with sound trial strategy. In the present case, defendant's counsel attacked the credibility of defendant's witnesses without any beneficial trial strategy to the defense. Hence, the facts are entirely distinguishable from the instant case and the analytical model employed in *Beals* does not apply here.

The usefulness of the Connecticut ruling, *State v Crespo* (246 Conn 665, 718 A2d 925, *cert denied* 525 US 1125), suffers from different infirmities. However, the facts, again, are distinguishable and the legal analysis is inapplicable to the case before us. There, the defendant, having killed someone in an alleged fit of rage, and possibly during a mental blackout, after informing his relatives what he did opted to turn himself in to police, for which endeavor he sought counsel's aid. At trial, the defendant asserted a defense resting on his allegedly impaired mental state. The attorney who aided him at the outset was retained to represent him at trial. The putative conflict was premised on the different roles played by counsel at the different times. Counsel contacted the state attorney's office, indicating that there might have been a homicide, but did not relate the defendant's name. Counsel drafted a written consent to search, which was signed by the defendant in the presence of relatives. The search was conducted and the defendant was arrested. In any event, at trial, a stipulation was introduced setting forth the defendant's conversation with counsel and counsel's preliminary investigative role. The stipulation only said, in sum and substance, that counsel had contacted the state attorney, informed him of a possible location of a body, indicated that he had a written consent authorizing a search, that counsel gave the keys to police, and that counsel informed the state attorney that the person who provided the keys was in his office. On appeal, the defendant argued, *inter alia*, that this stipulation constituted testimony adverse to his interests and thus posed an actual conflict. The Connecticut Supreme Court held that the issue was unpreserved and that additional procedural hurdles barred review under State law. However, the court also surmised, *inter alia,* that the decision to admit the stipulation may have been a reasonable trial strategy, discussed and agreed to by the defendant, to admit uncontested and readily ascertainable facts. Hence, to whatever extent dicta may be pried from *Crespo* to support a general proposition that sometimes a stipulation may be less damaging than testimony, simply has no bearing on the present case.

The majority also alludes to *People v Baldi* (54 NY2d 137), a landmark New York decision on effective representation, as supporting the general proposition that seemingly adverse statements by counsel may actually advance a client's interests. In *Baldi*, the proposition was apt, but the utility of *Baldi* is ultimately inapposite. In *Baldi*, the defendant had confessed to several homicides. Counsel elicited the defendant's denial, on

direct examination, that he had made any confessions. Counsel, testifying with the consent of the court and the prosecutor, noted his client's misstatements, but placed them in the context of an insanity defense, basically claiming that his client did not lie—he was crazy. Counsel testified to other observations he had made of the defendant in support of the insanity defense. The defendant was convicted. Although unusual, this was a credible strategy advancing defendant's insanity defense. Whether or not the strategy was the wisest one has no bearing on the present analysis, in which counsel had a motivation distinct from defendant's best interests. Moreover, the issue in *Baldi* was counsel's competence, and not conflict. Hence, *Baldi* obviously has no bearing on the present case.

As noted, there were various alternatives that could have been explored here: counsel could have requested to have been relieved, notwithstanding the timing of the request; counsel could have urged preclusion of the improper testimony as an alternative to being relieved, thus mitigating the potential for conflict that was extant in this record; and, the court could have more carefully controlled cross-examination that set the stage for an exposition of the conflict. These alternatives, though, were never adequately explored. Rather, counsel, the court, and the prosecutor all seized on the idea of counsel stipulating for the jury's benefit that defendant's witnesses lied.

The majority employs harmless error analysis to mitigate the taint. However, I respectfully submit that harmless error analysis is unavailable. When constitutional error occurs, reversal may be avoided only if there was "no reasonable possibility that the error might have contributed to the conviction" (*People v Ayala*, 75 NY2d 422, 431, citing *Chapman v California*, 386 US 18), a standard that logically cannot be satisfied when defendant's primary witnesses are substantially impeached as a result of the error. Moreover, some errors "are so serious that they operate to deny defendant's fundamental right to a fair trial. In such cases the reviewing court must reverse the conviction * * * without evaluating whether the errors contributed to the defendant's conviction." (*People v Hilliard*, 73 NY2d 584, 586-587.) Such an error occurs when the defendant's constitutional right to counsel has been abrogated (*id.*; *People v Felder*, 47 NY2d 287).

Finally, we all agree that there is no other basis to reverse, including defendant's challenge to the prosecutor's introduction of photographic slides of the victim. To the extent that

trial counsel did not object at trial to some slides, the challenge is unpreserved. Otherwise, the slides, which we have viewed, are probative of an issue at trial. The probative value of the slides is not outweighed by the prejudicial impact.

SULLIVAN, P. J., WILLIAMS and SAXE, JJ., concur with FRIEDMAN, J.; TOM, J., dissents in a separate opinion.

Judgment, Supreme Court, Bronx County, rendered August 1, 1997, affirmed.